BLUE WATER FISHERMAN'S
ASSOCIATION, et al.,
Plaintiffs,

v.

Norman MINETA, Defendant.

No. Civ.A. 99–2846 RWR.

United States District Court,
District of Columbia.

Sept. 25, 2000.

David Earl Frulla, Brand & Frulla, P.C., Washington, D.C., for plaintiffs.

Mark A. Brown, Janice M. Schneider, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ROBERTS, District Judge.

Plaintiffs, individuals and associations involved in the pelagic longline fishing industry, brought this challenge to the Commerce Secretary's [1] ("Secretary's") regulations implementing the final 1999 Highly Migratory Species Fishery Management Plan. The parties have filed cross-motions for summary judgment and presented oral arguments. Because I find that the Secretary acted within his authority as to all of his challenged actions save one, defendant's motion for summary judgment will be granted except as to the mandatory vessel monitoring system ("VMS") requirements. Plaintiffs' motion for summary judgment as to the VMS requirements will be granted since the record does not support a blanket requirement that all pelagic longline fishers, regardless of their proximity to targeted conservation areas, install a VMS unit. Accordingly, I will remand defendant's determinations under Counts Three and Four of the Amended Complaint regarding the mandatory VMS requirements, 50 C.F.R. § 635.69, to the Secretary.

## I. Introduction

Pelagic longline fishers catch species such as tuna, shark and swordfish. (Pls.' Stmt. Material Facts ("Pls.' Stmt.") ¶ 12.) These species are known as Highly Migratory Species ("HMS"). (*Id.*) [2] Pelagic longline fishers catch HMS with long fishing lines attached to "a series of leaders that connect to individual hooks in the ocean at specific depths." (*Id.* at ¶ 13.) There are less than 300 pelagic longline fishing boats currently in operation "over wide areas of the Atlantic Ocean, the Caribbean Sea, and the Gulf of Mexico," (*id.* at ¶ 37), and the number of longline boats has remained constant since 1987. (Def.'s Resp. to Pls.' Stmt. ¶ 37.) Pelagic longline fishers earn an average yearly income of $53,064, before paying fixed operating and maintenance costs. (Pls.' Stmt. ¶ 42.)

Pelagic longline fishing and pelagic fish are subject to statutory and regulatory regimes, as well as international agreements, designed to protect HMS. (Pls.' Stmt. ¶ 43.) The focus of this litigation is the final 1999 Highly Migratory Species Fishery Management Plan for Atlantic Tunas, Swordfish and Sharks ("HMS FMP"), promulgated by the National Marine Fish-

---

1. Norman Mineta was confirmed as the new Secretary of Commerce and is substituted as Defendant in place of William Daley, pursuant to Fed.R.Civ.P. 25(d)(1).

2. HMS are statutorily defined as "tuna species, marlin ..., oceanic sharks, sailfishes ..., and swordfish." 16 U.S.C. § 1802(20) (parenthetical Latin terms omitted).

eries Service ("NMFS"), pursuant to its authority delegated by the Secretary of Commerce ("Secretary") under the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. §§ 1801–83 (1994 & West. Supp.2000).

Plaintiffs claim that four of the HMS FMP's regulations are arbitrary and capricious, including (1) limits on Atlantic bluefin tuna ("ABT") that can be caught and kept per fishing trip, *see* 50 C.F.R. § 635.23(f); (2) an area ban on fishing during the month of June, *see* 50 C.F.R. § 635.21(c)(2); (3) annual quotas for blue sharks and subquotas for porbeagle sharks, *see* 50 C.F.R. § 635.27(b); and (4) a requirement that all pelagic longline fishers install a VMS unit on their vessels, *see* 50 C.F.R. § 635.69. Specifically, the plaintiffs claim that each regulation violates certain National Standards set forth in the Magnuson–Stevens Act. *See* 16 U.S.C. §§ 1851(a)(1)–(10), 1853(a)(1)(C).

In addition, plaintiffs claim that each regulation impermissibly imposes more regulatory restrictions on the commercial fishing sector than on the recreational fishing sector. Finally, plaintiffs assert that in promulgating the challenged regulations, the defendant violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612 (1994 & West Supp.2000), as amended by the Small Business Regulatory Enforcement and Fairness Act ("SBREFA"), Pub.L. No. 104–121, §§ 241–42, 101 Stat. 857, 864–68 (1996), by failing adequately to evaluate their effects on small business entities.

## II. Legal Framework

### A. The Magnuson–Stevens Act

The purpose of the Magnuson–Stevens Act is to protect HMS in waters extending two hundred (200) miles from the United States coast through conservation and management measures. *See* 16 U.S.C. §§ 1801(a), (b). Congress found that many HMS were "overfished"[3] and that as a result of "increased fishing pressure" and "the inadequacy of fishery resource conservation and management practices," the survival of HMS "is threatened." 16 U.S.C. § 1801(a)(2). Congress also found that other species, while not technically overfished, were "so substantially reduced in number that they could become similarly threatened." *Id.*

The Magnuson–Stevens Act directs the Secretary to prepare "fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield[4] from

---

**3.** Overfished is defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29).

A fishery is "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational and economic characteristics; and (B) any fishing for such stocks." 16 U.S.C. § 1802(13).

Maximum Sustainable Yield ("MSY") is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i). The Code recognizes that "[a]ny MSY values used in determining [optimum yield] will necessarily be estimates, and these will typically be associated with some level of uncertainty. Such estimates must be

based on the best scientific information available (see § 600.315) and must incorporate appropriate consideration of risk (see § 600.335). Beyond these requirements, however, Councils have a reasonable degree of latitude in determining which estimates to use and how these estimates are to be expressed." 50 C.F.R. § 600.310(c)(2)(ii).

**4.** Optimum yield is "the amount of fish which—(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." 16 U.S.C. § 1802(28).

each fishery," 16 U.S.C. § 1801(b)(4), including HMS. *See* 16 U.S.C. § 1854(g)(1). That responsibility is delegated to NMFS. *Id.*

A plan issued pursuant to the Magnuson–Stevens Act must be consistent with ten National Standards. *See* 16 U.S.C. § 1851(a). Plaintiffs raise five of these standards in their claims, arguing that each of the 1999 HMS FMP regulations at issue violated one or all of them. The standards at issue are:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

16 U.S.C. §§ 1851(a)(1), (2), (7)–(9).

Bycatch is defined as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. Such term does not include fish released alive under a recreational catch and release fishery management program." 16 U.S.C. § 1802(2). In other words, bycatch is those fish that fishers catch but throw back into the ocean, either because they are not the kind of fish that people will buy (being too small, of the wrong gender or of bad quality), or because a regulation dictates that the fish cannot be kept. *See* 50 C.F.R. § 600.350(c). This second kind of bycatch is referred to as a regulatory discard. Regulatory discards may occur where certain fish species are so overfished that they cannot be kept or sold. *See* 50 C.F.R. § 622.32 (describing those species of fish which may not be harvested or possessed). For example, the 1999 HMS FMP allows pelagic longline fishers fishing south of a certain latitude to retain only one large or medium bluefin tuna per fishing trip. *See* 50 C.F.R. § 635.23(f)(1). All fish caught in excess of that limit must be discarded.

In addition to the National Standards, two other provisions of the Magnuson–Stevens Act are at issue. First, the Act requires fishery management plans to allocate fishing benefits equitably between recreational and commercial fishers to the extent practicable. *See* 16 U.S.C. §§ 1853(a)(12), (14). Second, the Act requires that when the Secretary prepares the HMS FMP, the plan should, to the extent practicable, minimize any disadvantage the regulations might place on United States fishers as compared to foreign fishers. *See* 16 U.S.C. § 1854(g)(1)(C) (Secretary shall "evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors").

## B. Atlantic Tunas Convention Act

In addition to the Magnuson–Stevens Act, the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. § 971 (1994), provides further authority for the Secretary to promulgate tuna conservation programs. In enacting ATCA, Congress gave the State Department authority to participate

in the International Convention for the Conservation of Atlantic Tunas ("Convention"). *See* 16 U.S.C. §§ 971c, 971d(a). The purpose of the Convention is to protect Atlantic tuna species through international cooperation. (Def.'s Mem.Supp. Summ.J. ("Def.'s Mem.") at 4 & n. 1.) ATCA directs the Secretary to issue and enforce fishery management plans that comport with the Convention's objectives. *See* 16 U.S.C. § 971d.

Under ATCA, the State Department has broad discretion to implement tuna conservation programs, "except that no regulation ... may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a recommendation of the Commission." 16 U.S.C. §§ 971d(c)(1)(A), 971d(c)(3)(K). The "Commission" is the International Commission for the Conservation of Atlantic Tunas ("ICCAT"). 16 U.S.C. § 971a. ICCAT carries out the Convention's objectives and makes recommendations for achieving the Convention's ABT conservation goals. (Def.'s Mem. at 4.) Therefore, while the State Department cannot alter the United States ABT quota, pursuant to the Magnuson–Stevens Act and ATCA, it may develop conservation programs in conjunction with the fixed ABT quota.

## C. Standard of Review

The Magnuson–Stevens Act provides for judicial review of an HMS FMP under the same standards as those set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A)–(D) (1994). *See* 16 U.S.C. § 1855(f). The APA directs that "the reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In reviewing an agency's action to determine whether it was arbitrary and capricious, courts are constrained to review only those facts before the agency at the time of the action. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 744, 105 S.Ct. 1598; *accord Southwest Ctr. for Biological Diversity v. Babbitt,* 215 F.3d 58, 61 (D.C.Cir.2000) (reversing the district court's order directing that the agency collect more evidence to support its position because the district court was empowered to decide the issue presented based solely on the information available to the agency).

A court should engage in a searching and careful review of agency action but should not attempt to substitute its own judgment for the judgment of the agency. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Because the agency is expected to have expertise in its area, a certain degree of deference is due, particularly on issues about which experts disagree. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

Despite this deferential standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). To determine whether the agency has articulated a satisfactory explanation,

[A court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.' ... We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'

*Id.* (internal citations omitted). For an agency's decisionmaking to be rational under *Motor Vehicle Mfrs. Ass'n*, the agency "must respond to significant points raised during the public comment period" and "consider significant alternatives to the course it ultimately chooses." *Allied Local & Regional Mfrs. Caucus v. U.S. EPA*, 215 F.3d 61, 80 (D.C.Cir.2000).

Summary judgment is appropriate where "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment must provide the district court with a factual record sufficient to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This case involves parties' cross-motions for summary judgment as to certain administrative decisions in the 1999 HMS FMP. Specifically, I must determine whether the record supports the contention that 1999 HMS FMP satisfies the substantive requirements set out by the Magnuson–Stevens Act, as well as the RFA.

## III. Substantive Disputes

### A. Atlantic Bluefin Tuna Trip Limits

Plaintiffs challenge the limits on ABT that a longline fisher may catch and keep on any given fishing trip (referred to as the "ABT Trip Limit"). *See* 50 C.F.R. § 635.23(f). Plaintiffs argue that this provision is arbitrary and capricious because it violates the Magnuson–Stevens Act's National Standards One, Eight and Nine. I find that the defendant has described a sufficiently rational basis to support the need for ABT trip limits.

#### 1. Background

ABT is an overfished species. *See* A.R. Vol. 1, Doc. 23, Table A3, at 53. To aid conservation, ICCAT recommended per-nation ABT quotas under a twenty-year ABT fishery rebuilding program, beginning in 1999. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 17–18, 26.[5] NMFS in turn sets annual ABT quotas for each category of fishing vessel. *See* 50 C.F.R. § 635.27(a). Pelagic longliners currently are allocated 8.1% of the total United States quota. *Id.*

As a further conservation measure, NMFS does not allow pelagic longline fishers to target ABT. Longliners are allowed to catch and keep ABT only "incidentally." 50 C.F.R. § 635.23(f). This means that longliners may keep an ABT only if it is caught by accident when a longliner is fishing for other species. (Pls.' Stmt. ¶ 71.) NMFS first imposed this "incidental-only" restriction on the longliners in 1981. *See* 46 Fed.Reg. 8012 (1981). The parties agree that current ABT catches are purely incidental and not a result of

---

**5.** The total allowable ABT catch is 2,500 metric tons per year. Of this total, the United States is allotted 1,387 metric tons per year (or 55.48%). *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 17–18, 26. The total amount of ABT that the United States is permitted to land changes periodically according to ICCAT recommendations. *Id.* (noting that ICCAT's recommended ABT quota for the United States increased by 43 metric tons in 1998).

targeted fishing. (Pls.' Mem.Supp. Summ.J. ("Pls.' Mem.") at 26; Def.'s Mem. at 20.) At oral argument, plaintiffs stated that longline boats do not encounter ABT at all on ninety percent of their fishing trips.

In addition to the incidental-only restriction, pelagic longline fishers are not allowed to catch and keep more than a certain number of ABT during the course of each fishing trip.[6] *See* 50 C.F.R. § 635.23(f). Pelagic longliners must discard any ABT caught above the limit. NMFS also has imposed a regulation that subtracts longliners' dead discards from their yearly quota. *See* 50 C.F.R. § 635.27(a). This means that whenever a longliner catches an ABT that is killed, the weight of that ABT is subtracted from the total yearly quota, whether that fish is kept or thrown back. Any ABT caught in excess of the yearly quota are subtracted from the following year's quota. *See* 50 C.F.R. § 635.27(a)(9)(i). Consistently, if the annual quota has not been reached for a particular year, NMFS increases the following year's quota. *Id.* Plaintiffs assert that the trip limits in combination with the discard penalties is arbitrary and capricious.

Plaintiffs argue that the trip limits do not achieve any conservation benefits because longliners catch ABT only incidentally and, therefore, imposing trip limits will not change the amount of ABT actually caught. The trip limits merely guarantee that ABT will be have to be discarded. In combination with the requirement to subtract discards from the longliners' total quota, the trip limits all but ensure that longliners will never be able to harvest their allotted quota. Plaintiffs refer to this as a "death-spiral" effect: that is, the trip limits will cause discards, and the discards make it more likely that longliners will exceed their ABT quota, which in turn will cause the following year's quota to be reduced, only to start the cycle again.

Plaintiffs also point out that in past years, when they have been unable to harvest their allotted quota, NMFS has reallocated the unused portion of the longliners' quota to the "General Category,"[7] thus allowing fishers in the General Category to catch ABT in place of those that the longliners were unable to catch and keep. Plaintiffs do not argue that trip limits should be abolished; they merely argue that the current trip limits are so restrictive as to be arbitrary and capricious. Given that there is no evidence that longliners are targeting ABT, plaintiffs argue that the trip limits have no positive effect on conservation and may have a negative effect insofar as the limits encourage discards. In addition, plaintiffs state that the

6. The regulation in its entirety reads:
 (f) Longline category. Persons aboard a vessel permitted in the Atlantic Tunas Longline category may retain, possess, land, and sell large medium and giant BFT [the abbreviation for "Bluefin Tuna" and another name for ABT] taken incidentally in fishing for other species. Limits on such retention/possession/landing/sale are as follows:
 (1) For landings south of 34 degrees 00' N. lat., one large medium or giant BFT per vessel per trip may be landed, provided that, for the months of January through April, at least 1,500 lb. (680 kg.) and for the months of May through December, at least 3,500 lb. (1,588 kg.), either dw or round weight, of species other than BFT are legally caught, retained, and offloaded from the same trip and are recorded on the dealer weighout slip as sold.
 (2) For landings north of 34 degrees 00' N. lat., landings per vessel per trip of large medi-

um and giant BFT may not exceed 2 percent by weight, either dw or round weight, of all other fish which are legally caught, retained, and offloaded from the same trip and which are recorded on the dealer weighout slip as sold.
50 C.F.R. §§ 635.23(f)(1), (2). Plaintiffs contend that the second provision "permits the landing of one, or maybe two ABT per pelagic longline trip." (Pls.' Mem. at 22.)

7. The "General Category" consists of fishers who catch and sell ABT over 73 inches long, and it includes both commercial and recreational fishers. *See* A.R. Vol. 8, Doc. 152a, ch. 2, at 17. Currently, NMFS allocates 47.1% of the annual ABT quota to the General Category and 8.1% to Longliners. *See* 50 C.F.R. § 635.27(a).

trip limits have a substantial negative economic effect on the pelagic longline fishing industry.

Defendant argues that NMFS's main objective in maintaining the trip limits is to ensure that longliners do not begin targeting ABT. Defendant points out that a single ABT may "be worth thousands of dollars." (Def.'s Mem. at 21.) In an industry where the average income is $53,064, the financial incentive to catch these fish is quite strong. (*Id.*); *see also* A.R. Vol. 9, Doc. 152b, ch. 7, at 32. Defendants maintain that the lack of a statistical relationship between target fish landed and ABT caught merely demonstrates that the current trip limits are having the desired effect of assuring that longliners catch ABT only incidentally.

Defendant states that NMFS was aware that the regulations might produce bycatch and might also produce a burden on the longline industry. NMFS decided, however, that it did not want to risk creating an incentive to target ABT by increasing the trip limits. Plaintiffs counter by stating that an *overall* yearly ABT quota achieves that result without having the trip limits' adverse economic effects. Defendant asserts that it has minimized adverse economic impacts to the extent practicable in light of its primary conservation purposes.

### 2. Discussion

### a) National Standard One

Plaintiffs contend that the trip limits violate National Standard One by interfering with fishers' ability to catch their allotted quota, and preventing fishers from "achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). They appear to reason that because optimum yield involves, in part, "maintaining an economically viable fishery together with its attendant contributions to the national, regional and local economies, and utilizing the capacity of the Nation's fishing resources," 50 C.F.R.

§ 600.310(f)(2)(i), there is a "requirement that the fishery provide an economic return to fishermen and fishing communities. . . ." (Pls.' Mem. at 28.) Plaintiffs conclude that any regulation that detracts from their ability to catch and sell their portion of the ABT quota violates National Standard One, because the fishery as a whole would not be able to achieve optimum yield each year.

This argument is unavailing. NMFS is statutorily required to set out a plan that stops overfishing and rebuilds the stock of fish as quickly as possible. *See* 16 U.S.C. § 1854(e)(4)(A)(i). The statutory "optimum yield" definition recognizes that optimum yield is a standard that should be achieved over the long-run, not necessarily a standard that must be achieved with precision each year. *See* 50 C.F.R. § 600.310(f)(1)(ii) ("[i]n national standard 1, . . . 'achieving, on a continuing basis, the [optimum yield] from each fishery' means producing, from each fishery, a long-term series of catches such that the average catch is equal to the average [optimum yield]").

Plaintiffs' argument on this point does not adequately address the fact that National Standard One is meant to achieve optimum yield *while preventing overfishing.* Nor do the plaintiffs adequately address the requirement that NMFS take action to rebuild overfished stock. Nothing in the regulations presumes that longliners are *entitled* to catch their allotted quota. As defendant points out, even if applicable statutes and regulations required the HMS FMP to allow fishers to catch the optimum yield of ABT every year, such a requirement would not necessarily translate to a right vested in the pelagic longline industry to catch its annual allotted quota; rather, it would run to the rights of United States fishers as a whole.

The United States Court of Appeals for the District of Columbia Circuit has held that "an FMP can comply with [National] Standard 1 if there are social, economic or

ecological factors that justify the pursuit of a yield less than the maximum sustainable yield." *C & W Fish Co., Inc. v. Fox,* 931 F.2d 1556, 1563 (D.C.Cir.1991). In this case, optimum yield, which is determined by the maximum sustainable yield in cases of overfished fisheries, *see* 16 U.S.C. § 1802(28), does not have to be a primary imperative in light of NMFS's statutorily-mandated conservation objectives. The ABT trip limits, 50 C.F.R. § 635.23(f), do not violate National Standard One.

## b) National Standard Eight

 Plaintiffs argue that the trip limits do not achieve significant conservation benefits, and the economic costs are not justified under National Standard Eight's requirement that defendant must, "to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). Defendant argues that, while economic effects must be taken into account, such effects were not meant to trump the real purpose of the Magnuson–Stevens Act, which is to preserve and protect United States fisheries. He emphasizes that minimizing adverse impacts on fishing communities need be achieved only "to the extent practicable." 16 U.S.C. § 1851(a)(8). NMFS is and has been concerned that the ABT fishery cannot withstand any additional fishing pressure. *See* A.R. Vol. 36, Doc. G1, at 8013. Apparently, a surge of ABT catches by pelagic longliners occurred in 1980, and the high prices received for the ABT encouraged fishers to consider targeting ABT. *Id.* As a result, in 1981, NMFS imposed the first trip limits. *See* A.R. Vol. 8, Doc 152a, ch. 3, at 227.

Because NMFS is still concerned that the financial rewards of selling ABT will encourage fishers to target ABT, NMFS decided that the current trip limits should be maintained. Further, the HMS FMP points out that the problem with excessive discards would not be addressed by changing the trip limits. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 238–39. Increasing the trip limit would ensure only that longliners meet their quota earlier in the season, because the overall ABT quota would remain the same. After the overall quota has been met, all subsequent catches would have to be discarded, and, since ABT are caught only incidentally, the ultimate discard rate would be substantially the same.

NMFS determined that increasing the trip limits would risk creating an incentive for fishers to target ABT which could impair ABT conservation efforts. Plaintiffs have not provided sufficient evidence from the record to support their claim that the current trip limits fail to minimize adverse economic impacts on the longline fishing community to the extent practicable. Defendant's bases for maintaining the current trip limits to further its conservation purposes were ample and not unreasonable. The ABT trip limits, 50 C.F.R. § 635.23(f), do not violate National Standard Eight.

## c) National Standard Nine

 In claiming that the trip limits fail to "minimize bycatch" to the extent practicable, as National Standard Nine requires, 16 U.S.C. § 1851(a)(9), plaintiffs argue that the trip limits not only "require[ ] us to discard dead fish" and create more bycatch, but the limits penalize longliners because bycatch is subtracted from the longliners' yearly quota. A.R. Vol. 40, Doc. G141, at 5.

NMFS is required to minimize bycatch only "to the extent practicable." 16 U.S.C. § 1851(a)(9). Defendant maintains that it has minimized bycatch "to the extent practicable" by closing off a certain area of the Atlantic to pelagic longline fishers for the month of June, which is known for its high concentrations of ABT.[8]

---

**8.** The closure regulation, 50 C.F.R. § 635.21(c)(2), is discussed in the next sec- tion.

Again, NMFS determined that the current trip limits were necessary to prevent fishers from targeting ABT. It is well within the agency's discretion to make this determination, and defendant was justified in maintaining the current trip limits to further its conservation purposes. *See National Fisheries Inst. v. Mosbacher*, 732 F.Supp. 210, 223 (D.D.C.1990) ("this question of whether certain billfish conservation and management measures would be in the nation's 'best interest' is 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.... It is therefore especially appropriate for me to defer to the expertise and experience of [the agency].' ") (internal citations omitted). The ABT trip limits, 50 C.F.R. § 635.23(f), do not violate National Standard Nine.

## B. The June Closure

### 1. Background

NMFS issued a regulation to prevent pelagic longline fishers from landing ABT or swordfish in a specific area off of the Northeastern United States coast during the month of June. *See* 50 C.F.R. § 635.21(c)(2).[9] The regulation states:

> In the Northeastern United States closed area from June 1 through June 30 each year, no person may deploy a pelagic longline. In this area, during this time, no person shall retain an Atlantic tuna or swordfish on board a vessel that has a pelagic longline on board, unless the mainline, hooks, and floats are secured.

50 C.F.R. § 635.21(c)(2). Plaintiffs argue that this regulation (referred to as the "June Closure") interferes with the man-

dates of both ICCAT and ATCA that fishers must be allowed to catch their allotted quotas.[10] Plaintiffs assert that the June Closure violates National Standard One, because it "fails to provide for the optimum yield," and National Standard Eight, because it "fails to minimize adverse economic impacts." (Pls.' Mem. at 35.) Defendant maintains that neither ICCAT's recommendation nor ATCA's quota enforcement measures entitle pelagic longline fishers to catch a certain amount of ABT. In issuing the June Closure regulation, NMFS considered the regulation's negative economic impacts and weighed them against the conservation benefits from reduced bycatch. (Def.'s Mem. at 34–36.)

### 2. Discussion

#### a) National Standard One

■ As with their challenge to the ABT trip limits, plaintiffs challenge the June Closure under National Standard One, arguing that the closure will prevent fishers from "achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). Again, this claim must fail. Plaintiffs have not provided any support for the notion that they are entitled to catch and land the "optimum yield" of ABT each year. Rather, under National Standard One, "optimum yield" is measured over "a long-term series of catches." 50 C.F.R. § 600.310(f)(1)(ii). NMFS determined that the June Closure will reduce a significant amount of bycatch. *See* A.R. Vol. 7, Doc. 125, ch. 2, at 48. Given NMFS's statutory mandate to reduce bycatch, *see* 16 U.S.C. § 1851(a)(9), and con-

---

**9.** On August 1, 2000, NMFS issued final regulations creating three additional closure areas: (1) the DeSoto Canyon area, located off of Florida's west coast, to be closed year-round as of November 1, 2000; (2) the East Coast Florida area, located offshore between Florida's east coast and up through Georgia, to be closed year-round as of February 1, 2001; and (3) the Charleston Bump area, located near Wilmington Beach, North Carolina, to be closed from February 1 through

April 30 each year. *See* 65 Fed.Reg. 47,214, 47,235 (2000) (to be codified at 50 C.F.R. pt. 635). These closures are not at issue in the instant case.

**10.** Plaintiffs did not provide a citation to either ICCAT or ATCA mandates in support of their proposition that fishers must be allowed to catch their quota.

servation objectives under the Magnuson–Stevens Act as a whole, NMFS did not abuse its discretion in issuing the June Closure regulation. *See C & W Fish Co., Inc.*, 931 F.2d at 1563. The June Closure, 50 C.F.R. § 635.21(c)(2), does not violate National Standard One.

### b) National Standard Eight

█ Plaintiffs argue that the economic costs of the June Closure are not justified under National Standard Eight's requirement that defendant must, "to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). Defendant recognized that the June Closure would have negative economic impacts upon pelagic longline fishers. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 233. Defendant determined that the conservation benefits from the June Closure, however, would outweigh these costs. The record supports defendant's determination. NMFS estimated that the June Closure would reduce ABT discards in the closure area by fifty-five percent and would rebuild the ABT fishery. *See id.* at 231–33. NMFS stated that it did not expect the June Closure would have a significant negative economic impact on fishers, given the closure's shortest possible time-span. *See id.* at 231, 233.[11] NMFS used its discretionary authority to minimize the June Closure's impact "to the extent practicable." 16 U.S.C. § 1851(a)(8). The June Closure, 50 C.F.R. § 635.21(c)(2), does not violate National Standard Eight.

### C. Pelagic Shark Quotas

### 1. Background

NMFS issued a regulation that maintained the same annual quota for all pelagic sharks while imposing separate quotas on blue sharks and subquotas on porbeagle sharks. *See* 50 C.F.R. §§ 635.27(b)(1)(iii)(A), (C). If longliners exceed the yearly quotas or subquotas, the

excess is subtracted from the following year's quota. *See* 50 C.F.R. § 635.27(b)(iv)(A). If longliners exceed the separate blue shark quota, NMFS will reduce the *overall* pelagic shark quota by the excess amount. *See* 50 C.F.R. § 635.27(b)(1)(iv)(B). Sharks discarded dead are counted against their respective fishery's quota. *See* 50 C.F.R. § 635.27(b)(1)(iv)(C). Plaintiffs challenge the quotas on blue sharks and subquotas on porbeagle sharks, and have not challenged the overall pelagic shark quota.

Pelagic longline fishers encounter pelagic sharks incidentally to their other fishing activity. (Pls.Stmt.¶ 91.) For instance, longliners often catch blue sharks because blue sharks are "opportunistic feeders that feed near the surface." (*Id.* at ¶ 92.) Fishers sometimes encounter "anomalously large concentrations of pelagic sharks" by chance, causing the catch-rate on pelagic sharks to vary widely from year to year. (*Id.* at ¶ 97.)

Blue sharks may be used for their cartilage and their fins. (Id. at ¶ 95.) Otherwise, plaintiffs maintain, blue sharks have a relatively low commercial value, because their meat is not palatable. (*Id.* at ¶¶ 94–95.) Fishers try to avoid catching blue sharks and discard most that they do happen to catch. (*Id.* at ¶¶ 94–96.) In addition, the "vast majority of blue sharks are released alive." (*Id.* at ¶ 92.) Porbeagle sharks appear to be more commercially valuable, as there are some fishers who target these species along the New England coast. (*Id.* at ¶ 100.)

Plaintiffs contend that porbeagle and blue sharks are healthy, resilient species which are not overfished. Plaintiffs argue that NMFS has failed to gather enough information about these sharks and NMFS's current information does not justify the quota and subquota regulations. Plaintiffs are concerned that these regula-

---

**11.** NMFS considered alternatives ranging from monthly to year-round closures. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 231.

tions will increase regulatory discards and result in an ever-decreasing quota when the excess catch is subtracted from the following year's quota (that is, the "death spiral" effect). Plaintiffs assert that, because neither porbeagle nor blue sharks are overfished, NMFS has no justification for protecting these species or for the adverse economic impact that the quota and subquota will have on the pelagic longliner fishing industry. Importantly, plaintiffs point to the HMS FMP, in which NMFS stated,

> There is little evidence from the catch rate data that supports the need for more restrictive management measures at this time. However, members of the public have expressed the concern that the fully fished pelagic sharks may become overfished if the pelagic longline fishery, which encounters and lands pelagic sharks incidentally to tuna and swordfish fishing, begins to direct effort on pelagic sharks in response to declining tuna and swordfish quotas.

A.R. Vol. 8, Doc. 152a, ch. 2, at 70.

Defendant agrees that the porbeagle and blue sharks are not overfished but states that their biological status is unknown and not "relatively healthy," as plaintiffs contend. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 7, 9. Rather, porbeagle sharks are susceptible to rapid overfishing and require long stock recovery periods. *See id.* at ch. 2, at 70 & ch. 6, at 56. Blue sharks also take a relatively long time to rebuild their stock, especially because their gestation periods last almost a year. *See id.* at ch. 6, at 58–59. Data suggests that blue sharks may be vulnerable to overfishing and already in decline. *See id.*

Defendant also agrees that NMFS does not have sufficient data on the domestic pelagic shark fishery for stock evaluation purposes. Therefore, rather than changing the overall pelagic shark quota, NMFS

established a porbeagle shark subquota and a separate blue shark quota to ensure that porbeagle sharks—which are a targeted species—do not become overfished, and to reduce blue shark bycatch. (Def.'s Mem. at 40.)

### 2. Discussion

### a) National Standard One

Plaintiffs argue that by requiring dead porbeagle and blue shark discards to count against their respective subquota and quota (and, in the case of blue sharks, possibly the overall pelagic shark quota),[12] pelagic longliners will not be able to harvest their allotted percentages, and, therefore, they will never attain optimum yield. Plaintiffs' core argument is that, because neither porbeagle nor blue sharks are overfished, defendant cannot justify the quotas and subquotas, or the negative economic impacts that ensue.

Plaintiffs have not substantiated their contention that the quotas and subquotas will prevent them from "achieving, on a continuing basis, the optimum yield from each fishery" over the long run. 16 U.S.C. § 1851(a)(1); *see also* 50 C.F.R. § 600.310(f)(1)(ii). Merely because the full pelagic shark quota is not caught in a given year does not mean that the HMS FMP will fail to achieve optimum yield on a continuing basis over the long run.

Nor does the fact that neither porbeagle nor blue sharks are overfished at the present time mean that the quotas and subquotas are improper. National Standard One requires that "[c]onservation and management measures shall *prevent* overfishing...." 16 U.S.C. § 1851(a)(1) (emphasis added). The Magnuson–Stevens Act does not purport to protect only overfished species. The record shows that NMFS has cause to be concerned that porbeagle and blue sharks may become overfished. *See*

---

**12.** If pelagic longliners exceed their annual blue shark quota, the excess amount counts against the following year's overall pelagic shark quota. If the longliners exceed their annual porbeagle shark subquota, the excess amount counts against the following year's porbeagle subquota. *See* 50 C.F.R. §§ 635.27(b)(1)(iv)(A), (B).

A.R. Vol. 8, Doc. 152a, ch. 1, at 27 ("Generally, sharks are vulnerable to overfishing because they produce few offspring, mature late in life, and live many years."); A.R. Vol. 8, Doc. 152a, ch. 6, at 59 (blue shark species may be "vulnerable to overfishing because it is caught in tremendous numbers as bycatch in numerous longline fisheries" and preliminary catch rates suggest that the blue shark population "may be declining"); A.R. Vol. 33, Doc. E54, at 37 (porbeagle sharks, "like most other sharks, can not withstand heavy fishing pressure"). NMFS has justified the blue shark quota and the porbeagle shark subquota with evidence that the regulations will prevent overfishing, as National Standard One requires. Accordingly, the pelagic shark quotas, 50 C.F.R. §§ 635.27(b)(1)(iii)(A), (C), do not violate National Standard One.

### b) National Standard Two

■ Plaintiffs argue that NMFS does not have enough data and scientific information to justify the blue shark quota or the porbeagle shark subquota. To the extent that NMFS does have relevant data, plaintiffs argue that the data show that these restrictions are unwarranted. Specifically, NMFS stated that "[t]here is little evidence from the catch rate data that supports the need for more restrictive management measures at this time." A.R. Vol. 8, Doc. 152a, ch. 2, at 70.

Defendant maintained that the pelagic shark quotas and subquotas are based on the best available scientific evidence for domestic pelagic shark fisheries. Although NMFS does not have sufficient data for stock evaluation purposes, defendant explained that, because "certain pelagic shark species are transoceanic and subject to exploitation by many nations, a comprehensive stock evaluation would require the cooperation of many nations." (Def.'s Mem. at 38 (citing A.R. Vol. 8, Doc. 152a, ch. 2, at 70; A.R. Vol. 33, at E54–55; A.R. Vol. 34, at E59, E61, E65).) NMFS therefore determined that the "available

information on catch, landings, and catch rates, while informative of general trends, is insufficient to modify current estimates of maximum sustainable yield or quota levels of pelagic sharks." A.R. Vol. 8, Doc. 152a, ch. 2, at 70.

NMFS used the best information available to establish quotas separate from the overall quota, *not* to "modify" the current overall pelagic shark quota levels. An agency must base its determinations on information available at the time of preparing the HMS FMP or implementing the regulations. *See* 50 C.F.R. § 600.315(b)(2). I cannot demand more. *See Southwest Ctr. for Biological Diversity*, 215 F.3d at 61 (district court must assess the agency's evidence and resolve the parties' dispute, and it cannot "sidestep this responsibility by imposing an obligation upon the Secretary to find better data"). NMFS established the blue shark quota and the porbeagle shark subquota to prevent these species from becoming overfished, and to reduce dead blue shark discards. (Def.'s Mem. at 40.) NMFS may use the available information on porbeagle and blue sharks to create the conservation-based regulations. *See* 50 C.F.R. § 600.315(b) ("The fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP"); *Massachusetts v. Daley*, 170 F.3d 23, 30 (1st Cir.1999) (NMFS may regulate species even if it lacks complete information); *A.M.L. Int'l, Inc. v. Daley*, No. Civ.A. 00–10241–EFH, 2000 WL 1051935, at *9 (D.Mass. July 28, 2000) ("The fact that scientific information is incomplete, however, does not prevent the implementation of a fishery management plan."); *Parravano v. Babbitt*, 837 F.Supp. 1034, 1046 (N.D.Cal.1993) ("By requiring that decisions be based on the best scientific information available, the [Magnuson–Stevens] Act acknowledges that such information may not be exact or totally complete"), *aff'd*, 70 F.3d 539 (9th Cir.1995), *cert. denied*, 518 U.S. 1016, 116 S.Ct. 2546, 135

L.Ed.2d 1066 (1996); *National Fisheries Inst. v. Mosbacher*, 732 F.Supp. at 220 ("the Court will not construe the Magnuson[–Stevens] Act to tie the Secretary's hands and prevent him from conserving a given species of fish whenever its very nature prevents the collection of complete scientific information"). Accordingly, the pelagic shark quotas, 50 C.F.R. §§ 635.27(b)(1)(iii)(A), (C), do not violate National Standard Two.

### c) National Standard Eight

▉▉▉▉ The parties disagree as to whether the blue shark quota and the porbeagle shark subquotas "to the extent practicable, minimize adverse economic impacts on such communities," as National Standard Eight requires. 16 U.S.C. § 1851(a)(8). NMFS found that counting dead discards against future shark quotas could have a significant impact on the longline industry. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 105. However, NMFS also found that because pelagic longliners catch pelagic sharks only incidentally, any deterrent to catching these sharks should not have a significant effect on longliners' income. In fact, plaintiffs state that longliners "encounter pelagic sharks incidentally," and attempt to "avoid landing blue sharks if it is at all possible." (Pls.' Mem. at 38); *see also* A.R. Vol. 8, Doc. 152a, ch. 3, at 104–05. They also assert that the "vast majority of blue sharks are released alive." (Pls.' Stmt. ¶ 92.) This cuts against plaintiffs' own argument, because sharks released alive do not count against fishers' quotas and would not produce an adverse economic impact.

Given that NMFS has supported its conservation objectives—to prevent porbeagle and blue shark overfishing and reduce blue shark bycatch—with evidence in the administrative record, and given that any income longliners receive from pelagic sharks is incidental, NMFS has minimized adverse economic impacts to the extent practicable. The pelagic shark quotas, 50 C.F.R. §§ 635.27(b)(1)(iii)(A), (C), do not violate National Standard Eight.

### d) National Standard Nine

▉▉▉▉ Plaintiffs contend that the shark quotas require pelagic longline fishers to discard a substantial number of porbeagle and blue sharks caught incidentally, which effectively increases bycatch in violation of National Standard Nine. This Standard, however, provides that NMFS's regulations must minimize bycatch "to the extent practicable," and, "to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. §§ 1851(a)(9)(A), (B). "Fish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive." 50 C.F.R. § 600.350(d).

Given that pelagic sharks are caught only incidentally, NMFS would have to eliminate *all* pelagic shark quotas to guarantee a reduction in bycatch. NMFS has established that this is not a reasonable alternative which would further conservation objectives. Even though a certain amount of bycatch cannot be avoided when there are pelagic shark quotas and subquotas, NMFS has minimized bycatch mortality with regulations that count dead (but not live) discards against the applicable shark quota. *See* 50 C.F.R. § 635.27(b)(1)(iv)(C) ("Sharks discarded dead are counted against the applicable directed fishery quota."). NMFS has established strong regulatory incentives for fishers to refrain from killing pelagic sharks [13] and ensure that the sharks "be returned to the sea alive." 50 C.F.R. § 600.350(d). The pelagic shark quotas, 50 C.F.R. §§ 635.27(b)(1)(iii)(A), (C), do not violate National Standard Nine.

---

13. According to a letter from plaintiff Blue Water Fisherman's Association to NMFS's management division, pelagic longline fishers have killed blue sharks before discarding them, merely to retrieve their hooks. *See* A.R. Vol. 35, Doc. E87, at 26. The Blue Water Fisherman's Association stated, however, that this type of action was an "anomalous event." *Id.*

### D. Vessel Monitoring System

#### 1. Background

NMFS is requiring every pelagic longline fisher that operates or owns a commercial vessel permitted to fish for Atlantic HMS "to install a NMFS-approved vessel monitoring system (VMS) unit on board the vessel and operate the VMS unit whenever the vessel leaves port with pelagic longline gear on board." 50 C.F.R. § 635.69(a).[14] The VMS unit will allow NMFS to enforce time/area and fishery closures through ongoing communication with fishers and access to their position data. *Id.* at §§ 635.69(a), (h). VMS hardware, communication service providers, installation and service activation must conform to NMFS-approved specifications. *Id.* at §§ 635.69(b)–(d). Each fisher must activate the VMS unit "beginning 2 hours prior to leaving port and not ending until the vessel returns to port[,]" and "the unit must operate without interruption" while at sea. *Id.* at § 635.69(e). If an interruption occurs, the fisher must replace or repair the VMS unit according to NMFS-approved specifications. *Id.* at § 635.69(g).

Plaintiffs argue that NMFS, in imposing the VMS regulations, ignored or exceeded ICCAT's recommendations and violated National Standards Seven and Eight of the Magnuson–Stevens Act. *See* 16 U.S.C. §§ 1851(a)(7), (8). Defendant contends that ATCA and the Magnuson–Stevens Act provided ample authority for issuing the VMS regulations.

#### 2. Discussion

##### a) ICCAT's Recommendations on VMS Requirements

▮ NMFS is implementing a VMS program for all U.S. pelagic longline vessels, regardless of vessel size or type of HMS caught, rather than limiting the program to just "larger commercial vessels

fishing for [highly migratory Atlantic tuna species]" as ICCAT recommended. A.R. Vol. 8, Doc. 152a, ch. 2, at 103. As to ICCAT's recommendations, the HMS FMP states,

> In 1997, ICCAT recommended that nations implement a vessel monitoring system (VMS) program to track the fishing positions of their larger commercial vessels fishing for HMS by 1999. This FMP goes a step further to implement a VMS program for all U.S. pelagic longline vessels. The VMS program will support efforts to enforce time/area closures [and] ... will also allow NMFS to track a more accurate geographic distribution of pelagic longline fishing effort. In addition to providing an opportunity for real time monitoring, and delayed off-loading and/or transit during directed fishery closures, VMS will promote safety-at-sea and communication for participating vessels. In the future, VMS may be used to collect near real-time catch and effort data, as well as bycatch data reported by observers.

*Id.* Plaintiffs argue that this plan exceeds the Secretary's authority and is inconsistent with ICCAT's recommendation.

The ATCA gives the Secretary authority to implement ICCAT's recommendations "as may be necessary and appropriate to carry out such recommendation[s]." 16 U.S.C. § 971d(c)(1)(A). NMFS weighed the impacts of imposing VMS requirements on a broader population of vessels against the goal of conservation. *See Massachusetts Audubon Soc'y, Inc. v. Daley*, 31 F.Supp.2d 189, 193, 199–200 (D.Mass. 1998) (NMFS adhered to ICCAT's recommendations when it "weighed economic and scientific factors against the goal of stock recovery"). Plaintiffs have not identified any specific recommendations that the Secretary violated in issuing the VMS regulations. *See id.* (NMFS acted consis-

---

14. NMFS issued the final VMS rule on May 28, 1999, to be effective on September 1, 1999. *See* 65 Fed.Reg. 20,918–919 (2000). NMFS has delayed the effective date of the VMS requirement until October 1, 2000.

tently with ICCAT's recommendation to "emphasize" juvenile fish protection where plaintiffs had "not identified any specific recommendations that [were] violated by [NMFS's] allocation decisions"). Nor have plaintiffs cited to any prohibition upon the Secretary's ability to expand the coverage of VMS beyond just larger commercial Atlantic tuna vessels. No impropriety appears here.

### b) National Standards Seven and Eight

■ National Standard Seven provides that NMFS's "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). National Standard Eight provides that NMFS's "[c]onservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

Plaintiffs argue that NMFS violated these Standards, because the agency did not establish a rational basis for issuing the VMS requirements, and because the agency failed to give adequate consideration to alternative measures. In determining whether the agency has articulated a satisfactory explanation, including a "rational connection between the facts found and the choice made[,]" a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43, 103 S.Ct. 2856. To withstand review for arbitrary and capricious actions, NMFS must

have "respond[ed] to significant points raised during the public comment period" and "consider[ed] significant alternatives to the course it ultimately cho[se]." *Allied Local & Regional Mfrs. Caucus,* 215 F.3d at 80.

Because I find that the record does not support NMFS's proffered explanations for requiring VMS units on all pelagic longline vessels, regardless of whether the vessels would encounter closure-restricted areas, and because NMFS failed to demonstrate that it gave adequate consideration to significant, practicable alternatives, I hold that NMFS's actions were arbitrary and capricious, resulting in a clear error of judgment such that the VMS regulations, 50 C.F.R. § 635.69, violate National Standards Seven and Eight.

### 1) Blanket VMS Requirements

Defendant's VMS requirements were targeted at monitoring and enforcing closure-restricted areas. (Def.'s Mem. at 47–49.) NMFS imposed the VMS requirements on all pelagic longline fishers, regardless of whether they fish near a closure-restricted area. To date, NMFS has identified only four discrete coastal closure areas, including (1) a specific horizontal rectangular area off the New Jersey coast, *see* A.R. Vol. 8, Doc. 152a, ch. 3, at 230–31, to be closed during the month of June each year, 50 C.F.R. § 635.21(c)(2) (the "June Closure");[15] (2) the DeSoto Canyon area, located off of Florida's west coast, to be closed year-round as of November 1, 2000; (3) the East Coast Florida area, located offshore between Florida's east coast and up through Georgia, to be closed year-round as of February 1, 2001; and (4) the Charleston Bump area, located near Wilmington Beach, North Carolina, to be closed from February 1 through April 30 each year, *see* 65 Fed.Reg. 47,214, 47,235 (2000) (to be codified at 50 C.F.R. pt. 635). Yet NMFS has imposed the VMS requirements on *all* pelagic longline fishers who

---

**15.** This closed area covers from 39 – 40 degrees North longitude and 68 – 74 degrees West latitude. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 230–31.

operate or own a vessel carrying an Atlantic HMS permit, regardless of whether their vessel is anywhere near a time/area closure.

Defendant failed to show the conservation benefits of requiring VMS for those pelagic fishers who do not fish near existing time/area closures or whose areas may not face closures for years to come. Defendant's explanation that "VMS is likely to be used to monitor other closure areas in the future [because the] HMS FMP clearly expressed an intent to develop additional time/area closures[,]" (Def.'s Reply at 16 (citing A.R. Vol. 8, Doc. 152a, ch. 3, at 247)), does not provide a sufficient rational basis for NMFS's blanket VMS requirement. As one comment suggested, NMFS could have required VMS units for longliners located near time/area closures without requiring VMS units for longliners located at predetermined distances away from the closures. *See* A.R. Vol. 9, Doc. 152b, App. VIII, at 62, cmt. 5. NMFS's response that it "feels the benefits obtained from such a system justify the costs[,]" *id.*, does not provide a reasonable, coherent rationale for summarily dismissing this alternative.

## 2) Mandatory Economic Costs

The average pelagic longline fisher earns $53,064 annually, before paying for fixed costs and depreciation. *See* A.R. Vol. 9, Doc. 152b, ch. 7, at 32. NMFS itself recognized that, given "the difficult financial situation for most longline vessels, it is likely that the increased capital costs of

compliance with the requirement for a vessel monitoring system would have a significant economic impact on fishing entities." A.R. Vol. 9, Doc. 152b, ch. 7, at 34. In its final Regulatory Flexibility Analysis, NMFS set forth the final VMS costs to fishers as follows: (1) $1,800 to $5,000 to purchase the unit, including transceiver and antenna,[16] or $500 per year to lease a unit;[17] (2) $100 to $1,000 to install the unit;[18] (3) $1,000 per year for repair and maintenance costs; and (4) $600 per year to operate the unit (presumably including the daily communication charges). *Id.*; *see also* A.R. Vol. 8, Doc. 152a, ch. 3, at 297–98. Given that the lower cost "alternative" VMS unit "does not allow for two-way communication[,]"—and NMFS emphasized that overall "increas[ed] communication with markets, family members, vessel owners, and the Coast Guard" as well as "communication with shoreside contacts" are major benefits of the VMS regulation—the $5,000 cost estimate and $1,000 installation estimate are more reasonable estimates. *See* A.R., Vol. 8, Doc. 152a, ch. 3, at 297–98; A.R., Vol. 9, Doc. 152b, App. VIII, at 55. In addition, fishers must pay to replace VMS units as necessary and "could be required to pay for upgrades to the system[.]" *See* A.R., Vol. 8, Doc. 152a, ch. 3, at 297–98; 50 C.F.R. § 635.69(g).

Defendant maintains that VMS units provide added conservation and safety measures, better communication and, especially as to fishers, less costly offloading procedures.[19] Specifically, VMS units will

---

**16.** In a previous section of the HMS FMP discussing monitoring and reporting requirements, NMFS stated that VMS units cost up to $3,500 each. *See* A.R. Vol. 8, 152a, ch. 3, at 297. The $3,500 unit would, however, need a $2,000 "optional" personal computer if the fisher wanted to have real-time logbook reporting. *Id.*

**17.** A VMS unit leasing option, however, is "probably not possible at this time." A.R. Vol. 8, Doc. 152a, ch. 3, at 299.

**18.** The less expensive VMS units cost $100 to install, while the higher priced VMS units

cost $1,000 to install. *See* A.R. Vol. 8, 152a, ch. 3, at 297–98.

**19.** Currently, fishers must offload all or most of their catch before entering a closure-restricted area. *See* A.R., Vol. 8, ch. 3, at 298–99. VMS units would track the fishers to ensure that they had caught their fish in non-restricted areas. *Id.* Thus, with VMS units, fishers could avoid having to offload and store their catch in a foreign country and would not have to ship their catch to their home port. *Id.* These benefits would lower costs to distant water fishers. *Id.*

reduce bycatch (by enforcing closure-restrictions) and provide secure communication and emergency reports with real-time accuracy. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 297–99; A.R. Vol. 9, Doc. 152b, App. VIII, at 55. Finally, NMFS suggests that it considered cost-minimization alternatives when it decided to make less expensive VMS units available. *See* A.R. Vol. 9, Doc. 152b, App. VIII, at 55, 62. Defendant thus contends that such economic costs are justified based on "the benefits that would accrue—to fishers, to NMFS, and to society—from VMS use." (Def.'s Mem. at 54.)

Although defendant properly considered social benefits, *see* 50 C.F.R. § 600.340(d)(2), defendant failed to provide a sufficient explanation for imposing the economic burden of VMS requirements on all pelagic longline fishers who own or operate vessels having Atlantic HMS permits. NMFS's bare statement that it "feels the benefits obtained from such a system justify the costs" is insufficient. A.R. Vol. 9, Doc. 152b, App. VIII, at 62. Those fishers who do not operate near the closures still must pay approximately $6,000 to purchase and install the VMS unit, plus $1,600 per year for repair, maintenance and daily operation and communication costs, without producing any conservation benefit that NMFS can articulate or justify. The conservation benefits could be derived only from a subset of fishers, namely, those fishers near established time/area closures. If the VMS requirements are for the fishers' own benefit, fishers will be capable of performing their own individual cost-benefit analyses to determine whether they want to invest in a VMS unit. Accordingly, defendant has not minimized economic costs, where practicable, on the pelagic longline industry.

NMFS has provided neither a reasoned nor a conservation-based justification for implementing the VMS regulations and associated costs upon *all* fishers carrying Atlantic HMS permits, and, unable to discern NMFS's reasoning from the record, I cannot supply one. *See Motor Vehicle Mfrs. Ass'n, Inc.,* 463 U.S. at 43, 103 S.Ct. 2856. While NMFS must minimize costs only "where practicable [and] not absolutely," *Connecticut v. Daley,* 53 F.Supp.2d 147, 172–73 (D.Conn.1999), *aff'd, State of Connecticut v. U.S. Dept. of Commerce,* 204 F.3d 413 (2d Cir.2000), NMFS failed to implement practicable cost-minimization alternatives. Rather, NMFS imposed blanket VMS costs without showing how, by imposing these costs on fishers who do not operate near established time/area closures, the VMS regulations would provide conservation benefits. Therefore, the mandatory VMS requirements, 50 C.F.R. § 635.69, violate National Standards Seven and Eight of the Magnuson–Stevens Act.

### E. Fair Allocation of Restrictions and Benefits Among Commercial, Recreational and Charter Boat HMS Fisheries

 Plaintiffs claim that NMFS violated the Magnuson–Stevens Act by failing to collect sufficient data on recreational fisheries, such that NMFS could not allocate restrictions and benefits fairly as between commercial and recreational fishers. Specifically, plaintiffs point to the ABT trip limits and the shark quotas, claiming that inequitable regulatory measures have caused undue economic burdens on commercial fishers, in violation of National Standard Eight, 16 U.S.C. § 1851(a)(8). Plaintiffs also claim that defendant violated the following Magnuson–Stevens Act provisions, which require fishery management plans to:

(12) assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish; [and]

. . .

(14) to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery.

16 U.S.C. §§ 1853(a)(12), (14).

First, plaintiffs rely upon statistics which, they argue, show that NMFS has not controlled recreational fishing. Second, plaintiffs argue that trip limits impose unfair burdens on commercial fishers, because their unused ABT quota can be reallocated to other fishers, presumably recreational fishers. Finally, plaintiffs rely upon NMFS's statement in its final HMS FMP that, "[q]uantitative estimates of post-release mortality rates of sharks in rod and reel fisheries are not currently available[.]" A.R. Vol. 8, Doc. 152a, ch. 3, at 216. Plaintiffs suggest that, without this data, NMFS could not have minimized adverse economic impacts upon commercial fishers, assessed recreational bycatch or allocated harvest requirements equitably, as the Magnuson–Stevens Act, 16 U.S.C. §§ 1851(a)(8), 1853(a)(12), (14), requires.[20]

Plaintiffs' claims are not supported with record evidence, and their arguments ignore the rest of the National Standards. Congress, while aware of the potential conflicts among the Magnuson–Stevens Act's provisions, nevertheless "required the Secretary to exercise discretion and judgment in balancing among the conflicting national standards...." *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir.1996) (Secretary's approval of a plan which allocated benefits to fishers who owned or leased boats, to the detriment of non-owning crew members, did not violate the Magnuson–Stevens Act), *cert. denied*, 520 U.S. 1185, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997). Here, National Standards Two and Five are particularly relevant. National Standard Two requires the agency to base its regulations "upon the best scientific information available." 16 U.S.C. § 1851(a)(2). NMFS has collected data for both recreational and commercial fisheries through a variety of methods, depending on the particular fishery's characteristics. *See* A.R. Vol. 36, Doc. G17, at 12.[21] NMFS has ongoing research to determine post-release mortality among commercial and recreational fisheries. *See* A.R. Vol. 43, Doc. S76. At present, however, NMFS need only base its determinations upon information available at the time of preparing the HMS FMP or implementing the regulations. *See* 50 C.F.R. § 600.315(b)(2).

National Standard Five requires that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." 16 U.S.C. § 1851(a)(5). "National Standard Five makes it clear that 'efficiency, though important, is neither the sole nor primary objective of conservation and management measures.' ... Therefore,

---

**20.** Defendant argued that plaintiffs failed to state a claim under National Standard Eight, because plaintiffs' "failed to show how any adverse effects to fishing communities were the result of the unavailability of data on any particular sector of the fishery." (Def.'s Mem. at 58.) I am not required to decide defendant's argument, because the record does not support plaintiffs' challenge under National Standard Eight, as is discussed below.

**21.** For instance, NMFS collects commercial fishery ABT data based on landing reports and tagging done in dealer transactions. *See* 50 C.F.R. §§ 635.5(b)(1), (2). NMFS cannot collect similar data on recreational fisheries, because they cannot sell their ABT. Instead, NMFS implemented a toll-free reporting system (1–888–USA–TUNA) which recreational fishers must use to report ABT landings to the agency within 24 hours of the landing. *See* 50 C.F.R. § 635.5(c); *Massachusetts Audubon Soc'y*, 31 F.Supp.2d at 194–96 & n. 1 (holding that NMFS's ABT telephone reporting system was not arbitrary and capricious).

the fact that some inefficiencies may exist in a conservation and management system does not make the system inconsistent with National Standard Five." *Connecticut v. Daley*, 53 F.Supp.2d at 172 (quoting *J.H. Miles & Co., Inc. v. Brown*, 910 F.Supp. 1138, 1154 (E.D.Va.1995)). Even if plaintiffs could prove that a data imbalance caused commercial fishers to bear a disproportionate share of the economic burden relative to recreational fishers, "[t]he Secretary is allowed, under [National Standard Five], to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole." *Alliance Against IFQs*, 84 F.3d at 350.

Plaintiffs have not supported their assertions that NMFS failed to minimize adverse economic impacts upon commercial fishers, assess recreational fishing characteristics or allocate harvest requirements equitably among commercial and recreational fishers. "Controlling precedent requires that a plan not be deemed arbitrary and capricious, '[e]ven though there may be some discriminatory impact,' if the regulations 'are tailored to solve a [fishery-related] problem and to promote the conservation of [a fish species].'" *Id.* at 350 (quoting *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987)). I cannot find that the regulation is arbitrary or capricious, and plaintiff's equitable allocation claims under 16 U.S.C. §§ 1851(a)(8), 1853(a)(12), (14) must fail.

### F. International Parity

■ Plaintiffs argue that NMFS violated the Magnuson–Stevens Act's international parity requirement, 16 U.S.C. § 1854(g)(1)(C), because the June Closure, pelagic shark quotas and mandatory VMS costs effectively disadvantage domestic fishers in relation to their foreign competitors. (Pls.' Mem. at 35, 47–48, 63–64.) The Magnuson–Stevens Act requires the Secretary to "evaluate the likely effects, if any, of conservation and management measures on participants in

the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors." 16 U.S.C. § 1854(g)(1)(C). Because I have found that the VMS requirements are not valid under National Standards Seven and Eight, I will evaluate only the June Closure and pelagic shark quotas against the international parity provision.

Regarding the June closure, plaintiffs claim that it "fails to fairly and equitably allocate fishing privileges [under] 16 U.S.C. § 1854(g)(1)(C)." (Pls.' Mem. at 35.) Nothing in the record supports plaintiffs' conclusory allegation. Plaintiffs have shown no evidence that the Secretary failed to evaluate the likely effects, if any, on participants in the affected fisheries, or failed to minimize any disadvantage to plaintiffs in relation to foreign competitors. Plaintiffs' international parity argument as to the June Closure must fail.

■ Plaintiffs assert that in implementing the pelagic shark quotas, NMFS disadvantaged domestic fishers relative to their foreign competitors without sufficient justification. Plaintiffs, however, failed to provide any evidence to show that they in fact *would* be disadvantaged relative to their foreign competitors. Rather, they argue that NMFS violated the international parity requirement because "no other country is attempting to impose regulations specifically designed to impede their pelagic longline fishermen's ability to survive economically." (Pls.' Mem. at 48.)

Defendant contends that the conservation benefits from enforced quotas justify any potential disadvantages imposed upon domestic fishers. The record demonstrates that NMFS implemented the blue shark quota and the porbeagle shark subquota to provide conservation benefits and prevent overfishing. *See* A.R. Vol. 8, Doc. 152a, ch. 1, at 27, ch. 2, at 70 & ch. 6, at 59; A.R. Vol. 33, Doc. E54, at 37. I cannot second-guess NMFS's justifications; I may strike a regulation only if rational justifications are lacking. *See*

*Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43, 103 S.Ct. 2856; *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. 814. "Merely because [certain species] are also harvested beyond [United States waters] is no reason why the Secretary should not regulate them within the bounds of his authority under the [Magnuson–Stevens] Act. When Congress passed the Magnuson Act it was well aware of the existence of international fishery management agreements, especially . . . the International Convention for the Conservation of Atlantic Tunas [ICCAT]." *National Fisheries Inst. v. Mosbacher*, 732 F.Supp. at 221, *cited in Southern Offshore Fishing Ass'n v. Daley*, 995 F.Supp. 1411, 1428 (M.D.Fla.1998) (Congress did not intend the Secretary "to suspend his conservation and management obligations whenever fish stocks become lethally subject to both foreign and domestic harvest").

NMFS has set forth sufficient conservation benefits from the pelagic shark quotas. Plaintiffs have not shown any specific disadvantages that they would suffer in relation to foreign competition. The pelagic shark quotas do not violate section 1854(g)(1)(C) of the Magnuson–Stevens Act.

### G. The Regulatory Flexibility Act

Plaintiffs argue that the four contested regulations violate the RFA, as amended by the SBREFA, which directs agencies to evaluate the effect that new regulations will have on small business entities. *See* 5 U.S.C. §§ 601–12. When promulgating a proposed new regulation in the Federal Register, agencies are directed to perform an Initial Regulatory Flexibility Analysis ("IRFA") discussing the new rule's impact on small entities. The IRFA must contain the following information:

(b)(1) a description of the reasons why action by the agency is being considered;

(2) a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

(c) . . . a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as—

(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) the use of performance rather than design standards; and

(4) an exemption from coverage of the rule, or any part thereof, for such small entities.

5 U.S.C. § 603. In addition, when an agency promulgates a final rule, it must perform a Final Regulatory Flexibility Analysis ("FRFA"), which must contain:

(1) a succinct statement of the need for, and objectives of, the rule;

(2) a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a state-

ment of any changes made in the proposed rule as a result of such comments; (3) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available; (4) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and (5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected. 5 U.S.C. § 604.

The RFA's requirements "do not alter in any manner standards otherwise applicable by law to agency action." 5 U.S.C. § 606. The standard of review is the same as that under the APA—a court reviews the FRFA for arbitrary and capricious action. 5 U.S.C. § 611(a)(2). A reviewing court may remand a rule to the agency for failure to comply with the RFA. 5 U.S.C. § 611(a)(4)(A).[22]

As an initial matter, plaintiffs argue that "NMFS neither prepared an IRFA, took comments on the IRFA, or prepared an FRFA for its: (1) imposition of pelagic shark quotas, and (2) maintenance of the ABT trip limit." (Pls.' Mem. at 73.) The record shows, however, that NMFS prepared IRFAs for the pelagic shark quotas and the trip limits, which are included in the Draft HMS FMP and its separate "Bluefin Tuna Addendum." *See* A.R. Vol.

5, Doc. 79b, ch. 7, 8; A.R. Vol. 7, Doc. 125. NMFS also prepared an FRFA for the pelagic shark quotas and ABT trip limits. *See* A.R. Vol. 9, Doc. 152b, ch. 7.

The FRFA incorporates the IRFA's comments and responses regarding all of the challenged regulations. *See* A.R. Vol. 9, Doc. 152b, ch. 7, at 45. NMFS also performed an economic impact analysis for the pelagic shark quotas and ABT trip limits in its Final Regulatory Impact Review, which is included within the same HMS FMP volume as its FRFA. *See* A.R. Vol. 9, Doc. 152b, ch. 7. There is nothing improper about the placement of NMFS's analyses; an agency may perform its IRFA and FRFA in connection with any other regulatory analysis required by law, so long as the required subjects are addressed. *See* 5 U.S.C. §§ 605(a)–(c); *see also Associated Fisheries of Maine v. Daley,* 127 F.3d 104, 115 (1st Cir.1997) ("To disregard [an] otherwise compliant analysis simply because it is not ensconced in a specific format would be inconsistent both with the RFA's explicit authorization to avoid duplicative or unnecessary analyses ... and with the legislative concession that an agency 'may incorporate in a[RFA] any data or analysis contained in any other impact statement or analysis required by law' ").

Specifically, plaintiffs argue that, because NMFS failed to define a relevant universe of fishers who depend on revenue from pelagic sharks and ABT, NMFS did not perform valid RFAs for the pelagic shark quotas and the ABT trip limit regulations. Plaintiffs also argue that NMFS, in conducting its RFA as to the VMS regulation, failed to consider the VMS regulation's full economic impact on fishers. Finally, plaintiffs argue that NMFS did not address potential alternatives to either the VMS requirements, the ABT trip lim-

**22.** The RFA provides for judicial review of an agency's compliance with the FRFA requirements but not of an agency's compliance with the IRFA requirements. *See* 5 U.S.C. §§ 611(a)(1), (2); *Allied Local & Regional Mfrs. Caucus,* 215 F.3d at 78–79.

its, the June closure or the pelagic shark quotas.

### 1. The Relevant Small Business Entity Universe

█ Plaintiffs argue that NMFS failed to define a relevant universe of fishers who depend on revenue from pelagic sharks or ABT, and therefore could not have performed adequate RFA analyses for either the pelagic shark quotas or ABT trip limit regulations.

The RFA states that "the term 'small business' has the same meaning as the term 'small business concern' under section 3 of the Small Business Act, ..." 5 U.S.C. § 601(3). The relevant section of the Small Business Act defines "small business concern" as "one which is independently owned and operated and which is not dominant in its field of operation...." 15 U.S.C. § 632(a)(1). The agency "may specify detailed definitions or standards by which a business concern may be determined to be a small business concern for the purposes of this chapter or any other Act." 15 U.S.C. § 632(a)(2)(A). NMFS considered independently owned and operated pelagic longline fishers and their vessels as "small business entities" for purposes of the Magnuson–Stevens Act. This was not unreasonable.

█ Plaintiffs maintain that "NMFS's only RFA analyses relating to shark management measures employ as a universe for determining impact under the RFA the full universe of all fishermen who either had a permit to catch any kind of shark or caught any kind of shark (large coastal, small coastal, or pelagic)." (Pls.'s Mem. at 75 (citing A.R. Vol. 5, Doc. 79b, ch. 7, at 64–65).) Plaintiffs contend that neither subgroup comprises the universe affected by the shark quotas. Finally, plaintiffs point out that NMFS did not consider the impact of requiring fishers to count dead pelagic shark discards against overall shark quotas which include both pelagic and large coastal sharks.

NMFS, however, identified several possible universes that could be affected by the shark quotas and evaluated the impacts upon each universe. First, NMFS analyzed the potential impacts upon all permit holders in a particular fishery. Then NMFS narrowed this universe into two smaller universes: (1) permit holders who caught at least one shark in 1997; and (2) permit holders who caught at least one shark in 1997 and qualified for "limited access" permits, namely, those fishers who depend on particular shark fisheries for their livelihoods. *See* A.R. Vol. 9, Doc. 152b, ch. 7, at 29–30; *see also* A.R. Vol. 8, Doc. 152a, ch. 4, at 6–7. As defendant points out, limiting the universe to fishers who catch only pelagic sharks would be unreasonable, if not impossible. Pelagic longline fishers catch both pelagic and large coastal sharks, since, pursuant to 50 C.F.R. § 635.4(e), shark permits allow holders to catch pelagic, large coastal and small coastal sharks. Therefore, it would be nearly impossible for NMFS to identify a universe of fishers who catch only pelagic sharks. It is not even clear whether such a universe exists. Defendant properly identified several relevant universes of fishers who depend on revenue from pelagic sharks, and defendant evaluated the impact of the pelagic shark quotas upon these groups as the RFA requires.

█ Plaintiffs assert that, while "[t]he [ABT] trip limit applies only to pelagic longline fishermen, ... none of the universes NMFS used in its RFA analyses are comprised of only pelagic longline fishermen." (Pls.' Mem. at 77 (citing A.R. Vol. 5, Doc. 79b, ch. 7, at 44).) As with the pelagic shark quotas, NMFS sufficiently identified several possible universes that could be affected by the ABT trip limits and evaluated the impacts upon each universe. That is, NMFS analyzed the potential impacts upon all permit holders in a particular fishery. Then NMFS narrowed this universe into two smaller universes: (1) permit holders who caught at least one ABT in 1997; and (2) permit holders who

caught at least one ABT in 1997 and qualified for "limited access" permits. *See* A.R. Vol. 9, Doc. 152b, ch. 7, at 29–30; *see also* A.R. Vol. 8, Doc. 152a, ch. 4, at 6–7. Thus, defendant properly identified several relevant universes of fishers who depend on revenue from ABT, and defendant evaluated the impact of the ABT trip limits upon these groups as the RFA requires. *See* A.R. Vol. 7, Doc. 125; A.R. Vol. 9, Doc. 152b, ch. 7.

### 2. The Pelagic Shark Quota and VMS Requirement Impacts on Fishers

Plaintiffs contend that NMFS improperly concluded that the pelagic shark quotas and VMS requirements would have no significant impact on pelagic longline fishers. Both parties spent a good deal of time discussing the appropriate measure for determining whether the pelagic shark quotas' had "significant"[23] impacts. Their disputed measures are irrelevant, because defendant fully recognized that the pelagic shark quotas may have a "significant economic impact" on a "significant number" of pelagic longline fishers. *See* A.R. Vol. 5, Doc. 79b, ch. 7, at 71. In fact, defendant went on to conclude that the degree of the economic impact would depend upon whether fishers decreased their dead blue shark discards. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 92–93, 106.

■ Plaintiffs further emphasize that the impacts are particularly severe because of the requirement to count dead discards against the applicable fishery's quotas. Yet this requirement only furthers the primary conservation purpose of NMFS's shark quotas and acts to prevent overfishing as the Magnuson–Stevens Act requires. *See* 16 U.S.C. § 1851(a)(1). The RFA requirements cannot override the Magnuson–Stevens Act's mandate. *See* 5 U.S.C. § 606.

Second, as to the VMS requirements, plaintiffs argue that the FRFA "does not even acknowledge the potential that the [VMS] measure may add a cost of capital compliance that could render it uneconomic for certain pelagic longline vessels to remain in operation." (Pls.' Mem. at 79 (citing A.R. Vol. 9, Doc. 152b, ch. 7, at 33–34).) This is incorrect. NMFS recognized that, given "the difficult financial situation for most longline vessels, it is likely that the increased capital costs of compliance with the requirement for a vessel monitoring system would have a significant economic impact on fishing entities." A.R. Vol. 9, 152b, ch. 7, at 34.

### 3. Alternatives to the ABT Trip Limits, June Closure, Pelagic Shark Quotas and VMS Requirements

Plaintiffs claim that NMFS failed to complete a valid RFA analysis, because NMFS did not consider alternatives that would lessen the regulations' economic impacts on fishers.

■ First, as to the ABT trip limits and the June closure, plaintiffs assert that NMFS ignored the alternative to "relax the trip limit." (Pls.' Mem. at 80.) This alternative, plaintiffs argue, also eliminates the need for the June closure, because relaxing the trip limits would sufficiently reduce dead ABT discards. (*Id.*)

To the contrary, NMFS considered the impacts of relaxing *and* restricting the current trip limits. *See* A.R. Vol. 7, Doc. 125, ch. 2, at 50–52; A.R. Vol. 9, Doc. 152b, ch. 7, at 16. NMFS decided against changing the limits in either direction, because relaxing the limits could create an incentive for fishers to target ABT, and restricting the limits could increase bycatch. *See* A.R. Vol. 9, Doc. 152b, ch. 7, at 16. Accordingly, NMFS found that changing the trip limits could not serve as an alternative to the June closure. *See* A.R. Vol. 7, Doc. 125. Further, defendant con-

---

**23.** A regulation's impact is "significant" if it causes a five percent (5%) decrease in gross revenues for twenty percent (20%) or more of the affected universe. *See* A.R. Vol. 5, Doc. 79b, ch. 7, at 41.

sidered and adopted an alternative to their initial proposed closure, reducing the closure's size based in part on plaintiffs' comments. *See* A.R. Vol. 7, Doc. 125; A.R. Vol. 8, Doc. 152a, ch. 3, at 227–243; A.R. Doc. Vol. 40, Doc. G141, at 3.

Second, as to the pelagic shark quotas, plaintiffs claim that "NMFS failed to rationally consider the status quo as an alternative to the new pelagic shark measures the HMS FMP implemented." (Pls.' Mem. at 81.) Plaintiffs are incorrect. NMFS did consider the status quo as an alternative, but rejected it "because of concerns regarding the sustainability of current fishing mortality rates and the potential for fishing effort on those species known to have limited capacity to withstand fishing pressure (e.g., porbeagle sharks)." A.R. Vol. 8, 152a, ch. 3, at 93–94, 107–08.

 Third, as to the VMS requirements, plaintiffs claim that NMFS "did not consider conforming its VMS program to the ICCAT recommendation, implementing a VMS program similar to the one it employed for the Hawaiian pelagic longline fleet in which the Agency defrayed certain VMS related costs, or tailoring the VMS requirement to the stated need for the requirement in the first place (enforcement of closed areas)." (Pls.' Mem. at 79.) While NMFS clearly did not give in-depth consideration to *every* alternative, the RFA requires only that agencies consider alternatives that would "accomplish the stated objectives" of the Magnuson–Stevens Act. 5 U.S.C. § 604(a)(5); *see also Grand Canyon Air Tour Coalition v. FAA,* 154 F.3d 455, 470–71 (D.C.Cir.1998) (FAA satisfied RFA requirements "to demonstrate a rational decisionmaking process [by] respond[ing] to relevant comments and consider[ing] reasonable alternatives"). NMFS fulfilled the RFA's requirements by responding to relevant comments, adopting alternative regulations that allowed fishers to install less expensive types of VMS equipment and considering (though not necessarily adopting) other reasonable alternatives. *See* A.R. Vol. 9, Doc. 152b, ch. 7, at 34 & App. VIII, at 55, 62.[24]

## IV. Conclusion

Based on the evidence in the administrative record, the ABT trip limit, June Closure and pelagic shark quota regulations are consistent with the Magnuson–Stevens Act, 16 U.S.C. §§ 1851(a)(1), (2), (7) –(9), 1853(a)(12), (14), 1854(g)(1)(C). The Secretary duly considered plaintiffs' arguments and comments, but acted within his discretion when he promulgated these final rules. Further, the ABT trip limit, June Closure, pelagic shark quota and VMS requirements are consistent with the Regulatory Flexibility Act, 5 U.S.C. §§ 604(a)(2) –(5).

There is inadequate evidence in the record, however, to support the VMS regulation under National Standards Seven and Eight of the Magnuson–Stevens Act, 16 U.S.C. §§ 1851(a)(7), (8). The Secretary failed to set forth a rational connection between the factual record and the choice to impose a blanket VMS requirement on all pelagic longline fishers, regardless of whether they are geographically located near a time/area closure where the VMS unit would provide a conservation benefit. *See Motor Vehicle Mfrs. Ass'n, Inc.,* 463 U.S. at 43, 103 S.Ct. 2856.

Accordingly, I will: (1) grant defendant's motion for summary judgment on Counts One, Two, Five, Six, Seven and Nine[25] of the Amended Complaint and deny plaintiffs' motion for summary judgment as to those counts; (2) grant plaintiffs' motion for summary judgment on

---

24. Defendants stated at the motions hearing that NMFS's subsidization of VMS equipment for the Hawaiian fleet was part of a pilot program and did not exemplify a viable alternative in the long term.

25. Plaintiffs elected not to pursue Count Eight of their Complaint. (Pls.' Mem.Supp. Summ.J. at 4 n. 1.)

Count Three and deny defendant's motion for summary judgment on Count Three; (3) grant defendant's motion for summary judgment on Count Four regarding the ABT per-trip landing limit, 50 C.F.R. § 635.23(f), the closure of certain fishing areas during the month of June, 50 C.F.R. § 635.21(c)(2), quotas for blue sharks and subquotas for porbeagle sharks, 50 C.F.R. § 635.27(b), and failure to collect data, and deny plaintiffs' motion for summary judgment on those issues; (4) grant plaintiffs' motion for summary judgment on Count Four regarding the mandatory VMS requirements, 50 C.F.R. § 635.69, and deny defendant's motion for summary judgment on Count Four regarding the mandatory VMS requirements. I will remand the agency's VMS determinations to the Secretary with instructions to undertake further consideration of the scope of the VMS requirements in light of any attendant relevant conservation benefits. An Order consistent with this Opinion is being issued today.