**BLUE WATER FISHERMEN'S ASSOCIATION, et al., Plaintiffs,**

v.

**NATIONAL MARINE FISHERIES SERVICE and Donald L. Evans, Secretary of Commerce, Defendants.**

C.A.No. 00–12313–NG.

United States District Court, D. Massachusetts.

Aug. 20, 2001.

Thomas J. Muzyka, Clinton & Muzyka, Boston, MA, Patrick O. McAleer, Boston, MA, Gary C. Adler, O'Connor & Hannan, George J. Mannina, Jr., O'Connor & Hannan, LLP, Washington, DC, for Plaintiffs.

Samuel D. Rauch, III, U.S. Department of Justice Environment & National Resources Div., Washington, DC, Anton P. Giedt, U.S. Attorney's Office, Boston, MA, for Defendants.

Bruce E. Falby, Hill & Barlow, Boston, MA, Stephen E. Roady, Monica B. Goldberg, Sylvia F. Liu, Eric A. Bilsky, Washington, DC, for Movants.

## MEMORANDUM AND ORDER RE: PRELIMINARY INJUNCTION

GERTNER, District Judge.

On July 13, 2001, the National Marine Fisheries Service ("NMFS")[1] issued emergency regulations, closing portions of the Northeast Distant Statistical Reporting Area of the Atlantic Ocean ("NED")[2] to pelagic longline fishing by United States

---

1. The NMFS is an agency within the National Oceanic and Atmospheric Administration ("NOAA"), which is an agency within the United States Department of Commerce.

2. The NED closure area (20 to 60° W, 35 to 55° N) encompasses 2,631,000 square nautical miles and includes the Grand Banks.

flag fishing vessels.[3] *See* 66 Fed.Reg. 36711. Additionally, the emergency regulations require licensed pelagic longline vessels to follow certain requirements in deploying their gear throughout the entire Atlantic Ocean (including the Gulf of Mexico and Caribbean Sea).[4] The emergency regulations are to remain in effect until January 9, 2002.

The rule, implemented to reduce the bycatch[5] and bycatch mortality of loggerhead and leatherback sea turtles in the Atlantic pelagic longline fishery,[6] was promulgated pursuant to emergency powers vested in the Department of Commerce by the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. § 1855(c).

The Magnuson–Stevens Act, revised in 1996 by the Sustainable Fisheries Act, Pub.L. No. 104–297, 110 Stat. 3559 (1996), 16 U.S.C. § 1801 *et seq.*, is the primary law regulating fishery resources and fishing activities in U.S. federal waters. It re-

quires the establishment of independent regional councils that draft a Fishery Management Plan ("FMP") for each fishery within their jurisdiction. The FMPs establish rules for each fishery in accordance with national conservation and management standards[7] as well as any other pertinent laws, subject to approval by the Secretary of Commerce. 16 U.S.C. §§ 1852, 1853. *See generally Massachusetts v. Daley*, 170 F.3d 23, 27–28 (1st Cir.1999). The emergency rules at issue were implemented in accordance with the Fishery Management Plan for Atlantic Tunas, Swordfish, and Sharks [hereinafter "HMS FMP" which stands for "highly migratory species fishery management plan"].[8]

The plaintiffs—vessel owners, operators, and personnel for pelagic longline fishing operations—filed suit challenging the closure of the NED.[9] They seek preliminary injunctive relief on the grounds that the NMFS relied on flawed scientific data and methods in issuing the regulations and

---

3. Pelagic longline fishermen fish highly migratory species ("HMS") such as swordfish, tuna, and shark by setting a mainline—often miles long—behind their vessel to which floats and bailed hooks are attached and suspended at specific depths. The longline is not fixed to or in contact with the ocean bottom. Approximately 140 U.S. pelagic longline boats remain active.

4. By licensed, I mean vessels that have been issued Federal highly migratory species limited fishing permits.

5. "Bycatch" means "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards ..." 16 U.S.C. § 1802(2).

6. Under the Endangered Species Act ("ESA"), federal agencies are required to insure that actions they authorize, fund, or implement are "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2).

Leatherback sea turtles were listed as an endangered species in 1970; loggerhead sea turtles, as a threatened species in 1970. *See* 54 Fed.Reg. 53170.

7. The NMFS employed national standard nine (of ten) in closing the NED ("Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch"). 16 U.S.C. § 1851(a)(9).

8. The Final Rule to implement the HMS FMP was published in the Federal Register on May 28, 1999, 64 Fed.Reg. 29,090, codified at 50 C.F.R. 635.

9. The plaintiffs initially filed suit on November 8, 2000, challenging a previous emergency action that closed the NED from October 10, 2000 through April 9, 2001. The action was stayed pending review by the NMFS as to whether the emergency closure would be extended beyond April 9, as the principal season for longlining in the NED begins in July.

that the closure places an unfair burden on the plaintiffs to generate the bulk of desired conservation gains.[10]

▪ Though I am sympathetic to the plight of the longline fishermen who are being adversely affected by the closure of the NED, it appears that § 1855(f)(1)(A) of the Magnuson–Stevens Act leaves me no option but to decline preliminary injunctive relief. That provision forbids this Court from staying enforcement of an administrative rule pending review on the merits. Section 1855(f)(1) provides:

> Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated; except that (A) *section 705 of such Title is not applicable;* and (B) the appropriate court shall only set aside any such regulation on a ground speci-

fied in section 706(2)(A), (B), (C), or (D) of such Title.

(emphasis added).

Section 705 allows a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending the review proceedings." Thus, the exclusion of Section 705 powers prevents me from issuing the type of preliminary relief sought by the plaintiffs.[11] *See Kramer v. Mosbacher,* 878 F.2d 134, 137 (4th Cir. 1989); *Cape Cod Commercial Hook Fishermen's Ass'n v. Daley,* 30 F.Supp.2d 111, 113 (D.Mass.1998); *Pacific Coast Federation v. Secretary of Commerce,* 494 F.Supp. 626, 628–29 (N.D.Cal.1980).

The plaintiffs advance the following two arguments to evade the jurisdictional limitation imposed on this Court by the Magnuson–Stevens Act. First, they claim that they are challenging the June 8, 2001 NMFS biological opinion ("BiOp")[12] that Atlantic pelagic longline fishing jeopardizes the continued existence of loggerhead and leatherback sea turtles under the ESA

---

**10.** In 1999, for example, the 10 vessels that fished in the NED grossed approximately $3.2 million in total revenues for swordfish catches. The Department of Commerce estimates that closing the NED could reduce total annual revenues of the entire swordfish industry by almost 20 percent, losses that will be borne for the most part by those who fish primarily in the NED.

**11.** The conference report to the Magnuson–Stevens Act stated that a "reviewing court is without authority to enjoin the implementation of those regulations pending the judicial review." 1976 U.S.Code Cong. & Admin.News, 593, 678.

**12.** Section 7 of the ESA requires all federal agencies to consult with either the Fish and Wildlife Service or the NMFS (whichever is given responsibility to protect the species in question) in order to evaluate whether an action or policy may have an effect on a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12 (formal consultation); 50 C.F.R.

§ 402.13 (informal consultation). The consultation generates a "biological opinion" that makes a determination as to whether a proposed action is likely to jeopardize the continued existence of the species, includes an "incidental take statement" (specifying the number of individual animals that may be taken incidentally by the proposed activity), and proposes reasonable alternatives to the agency. 50 C.F.R. § 402.14(g)(4), (h). Because the NMFS has jurisdiction over ESA listed species in the ocean marine environment (such as turtles when they are not nesting on land), the NMFS consulted with itself to generate the BiOp (the NMFS Office of Sustainable Fisheries consulted with the NMFS Office of Protected Resources). The BiOp in question estimated that closing the NED and modifying the deployment of pelagic longline gear would achieve a 55% reduction in bycatch mortality of loggerhead and leatherback sea turtles.

(which does not proscribe injunctive remedies) rather than under the Magnuson–Stevens Act.

■ Second, they argue that this Court is not precluded from preliminarily enjoining the NMFS because, under 16 U.S.C. § 1811, the Secretary of Commerce lacks authority to extend the Magnuson–Stevens Act to HMS fisheries like the NED that are outside the U.S. Exclusive Economic Zone ("EEZ") (beyond 200 miles from the U.S. coast).[13]

These arguments are unavailing. As to the first, the plaintiffs in this case are challenging the emergency closure of the NED to longline fishing. While those regulations were premised on the jeopardy findings of the BiOp, the NMFS implemented the rule pursuant to its authority over FMPs under the Magnuson–Stevens Act, *not the Endangered Species Act. See* 66 Fed.Reg. 36711. As another court in this District noted in denying a motion for preliminary injunction pursued on similar grounds,[14] couching the action in different statutory language "is not a hook which can remove the prohibitions of the Magnuson–Stevens Act." *A.M.L. International, Inc. v. Daley,* Civil Action No. 00–10241–EFH (May 18, 2000) at p. 2.

With respect to their second argument, the plaintiffs have overlooked the exception provided under 16 U.S.C. §§ 1811(a) and 1812 that permits extraterritorial ex-

tension of NMFS authority over HMS fisheries beyond the EEZ.[15] Section 1811(a) provides:

(a) In the exclusive economic zone

*Except as provided in section 1812 of this title,* the United States claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone.

(b) Beyond the exclusive economic zone

The United States claims, and will exercise in the manner provided for in this chapter, exclusive fishery management authority over the following: (1) All anadromous species throughout the migratory range of each such species beyond the exclusive economic zone; except that that management authority does not extend to any such species during the time they are found within any waters of a foreign nation. (2) All Continental Shelf fishery resources beyond the exclusive economic zone.

(emphasis added).[16]

Section 1812, governing highly migratory species, provides as follows:

The United States shall cooperate directly or through appropriate international organizations with those nations involved in fisheries for highly migrato-

---

**13.** *See* 16 U.S.C. § 1802(11), citing Proclamation Numbered 5030, dated March 10, 1983; *see also National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. 210, 212 (D.D.C. 1990).

**14.** The plaintiffs in that case argued that Magnuson–Stevens did not prevent the court from enjoining the NMFS's interim final rule implementing the "spicy dogfish" FMP because the Regulatory Flexibility Act, 5 U.S.C. § 611—under which the plaintiffs brought suit—does not prohibit injunctive relief.

**15.** As the defendants have not disputed that the NED extends beyond 200 nautical miles from U.S. coastal boundaries, 1 accept for purposes of this motion that the NED falls outside the EEZ.

**16.** HMS are neither anadromous species nor Continental Shelf resources as defined by 16 U.S.C. §§ 1802(1), (7), and (20).

ry species with a view to ensuring conservation and shall promote the achievement of optimum yield of such species throughout their range, both within and *beyond the exclusive economic zone.*

(emphasis added).

In this case, the NMFS ordered the emergency closure of the NED in direct cooperation with international efforts to conserve highly migratory species. On August 5, 1975, Congress enacted the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. § 971, a domestic counterpart to the International Convention for the Conservation of Atlantic Tunas ("Convention"), signed at Rio de Janeiro on May 14, 1966. The Convention had established the International Commission for the Conservation of Atlantic Tunas ("ICCAT"), which the United States entered in 1969,[17] to carry out the objectives of the Commission, including coordinating scientific research and recommending regulatory measures to maintain tuna stocks at sustainable yields. A number of countries that harvest tuna and other HMS in the Atlantic belong to the ICCAT.

Under the Atlantic Tunas Convention Act, the Secretary of Commerce, acting through the NMFS, is authorized by Congress to participate in administering the Convention, including the implementation of Fishery Management Plans. *See* 16 U.S.C. § 971d(a) (the Secretary of Commerce may promulgate "such regulations as may be necessary to carry out the purposes and objectives of the Convention"); 50 C.F.R. § 635.1; *see also Atlantic Fish Spotters Ass'n v. Daley*, 8 F.Supp.2d 113, 115 (D.Mass.1998). In other words, when it closed the NED on an emergency basis, the NMFS was implementing the provisions of the Convention through the ATCA and the Magnuson–Stevens Act.[18] Thus, in enforcing the HMS FMP in conjunction with foreign efforts under the Convention, 16 U.S.C. § 1812 provides jurisdiction beyond the EEZ.[19]

Accordingly, as section 1855(f)(1)(A) of the Magnuson–Stevens Act proscribes a court from preserving a party's status or rights pending review on the merits, the plaintiffs' Motion for a Preliminary Injunction [docket entry # 15] is **DENIED.**[20]

---

**17.** *See* 20 U.S.T. 2887, TIAS 6767.

**18.** In establishing the HMS FMP, the Department of Commerce noted that regulations will be implemented consistently with "the recommendations of the International Commission for the Conservation of Atlantic Tunas (ICCAT) as required by the Atlantic Tunas Convention Act (ATCA)." 64 Fed.Reg. 29,090.

**19.** In general, extraterritorial jurisdiction may be extended by Congress either expressly or by clear implication. *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). Here, the Congressional intent to extend United States jurisdiction to areas on the high seas beyond sovereign jurisdictional limits is clear. *E.g.* 16 U.S.C. § 1801(c)(5) ("It is further declared to be the policy of the Congress ... to support and encourage active United States efforts to obtain internationally acceptable agreements which provide for effective conservation and

management of fishery resources, and to secure agreements to regulate fishing by vessels or persons beyond the exclusive economic zones of any nation"); 16 U.S.C. § 1826g ("The President shall utilize appropriate assets of the Department of Defense, the United States Coast Guard, and other Federal agencies to detect, monitor, arid prevent violations of the United Nations moratorium on large-scale driftnet fishing on the high seas for all fisheries under the jurisdiction of the United States and, in the case of fisheries not under the jurisdiction of the United States, to the fullest extent permitted under international law").

**20.** Because the statute prevents this Court from issuing a preliminary injunction, I need not consider whether the plaintiffs have prevailed on the threshold requirements to warrant equitable relief—substantial likelihood of success on the merits, significant risk of irreparable harm, balance of hardships, and the

At the same time, the plaintiffs are not without immediate recourse, as the Magnuson–Stevens Act trades preliminary relief for expedited review, 16 U.S.C. § 1855(f)(4). In order to effectuate that review, the parties are hereby **ORDERED** to submit a joint proposed pre-trial schedule under Rule 16.1 Fed.R.Civ.Pro. on or before September 5, 2001.

**SO ORDERED.**

public interest. *TEC Eng'g Corp. v. Budget Molders Supply, Inc.,* 82 F.3d 542, 544 (1st Cir.1996). To be clear, however, the fact that the defendants are entitled to substantial deference in the enforcement of administrative regulations (under the Administrative Procedure Act, 5 U.S.C. § 706(a)(1), agency decisions stand unless they are shown to be "arbitrary, capricious, or an abuse of discretion") and the fact that the balance of equities—on this truncated record—is difficult to surmise (the economic loss of the plaintiffs measured against the public interest in conservation), militates against granting the motion for a preliminary injunction. *See generally Strahan v. Coxe,* 127 F.3d 155, 171 (1st Cir.1997) ("in the context of ESA litigation … the balance of hardships and public interest tips heavily in favor of protected species") (citations omitted).