**BLUE WATER FISHERMEN'S ASSOCIATION, et al., Plaintiffs,**

v.

**NATIONAL MARINE FISHERIES SERVICE and Donald L. Evans, Secretary of Commerce, Defendants,**

and

**Turtle Island Restoration Network, et al., Defendant–Intervenors**

No. 00–12313–NG.

United States District Court, D. Massachusetts.

Sept. 30, 2002.

Thomas J. Muzyka, Boston, MA, for Plaintiffs.

Samuel D. Rauch, III, U.S. Department of Justice, Environment & National Resources Div., Washington, DC, Anton P. Giedt, U.S. Attorney's Office, Boston, MA, for Defendants.

Bruce E. Falby, Hill & Barlow, Boston, MA, Stephen E. Roady, Monica B. Goldberg, Washington, DC, Sylvia F. Liu, Washington, DC, for Turtle Island Restoration Network, Center for Biological Diversity.

### MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT

GERTNER, District Judge.

Pelagic longline fishermen target highly migratory species ("HMS"), primarily swordfish, tuna, and shark, from vessels on the open seas. Their *modus operandi* is to trail "longlines"—miles long, in fact—behind their vessels, from which floaters and hooks are suspended on "branch lines" into depths earmarked for HMS. At present, some 140 licensed pelagic longline vessels cruise the North Atlantic under the U.S. flag.

It is not uncommon, in the course of a longlining venture, for untargeted species to get caught up in the line and other gear trailing behind longline vessels, or even to hook themselves. The pelagic longliner must then disentangle and/or unhook the unwanted catch and discard it. At best, this largely unavoidable "bycatch" is a nuisance to the fishermen. But when the incidental haul of the pelagic longliner includes delicate and protected species such

as the loggerhead or leatherback sea turtle, the issue of bycatch becomes a problem for regulators.

The plaintiffs in this action, vessel owners, operators, and personnel in the pelagic longline fishing industry, seek injunctive relief from regulations by the National Marine Fisheries Service ("NMFS") that close off their access to fisheries in the Northeast Distant Statistical Reporting Area of the Atlantic Ocean ("NED"). They underscore their legal arguments with the claim that the regulations wreak havoc on their very livelihood.

The regulations, which also impose certain restrictions in the deployment of pelagic longline gear elsewhere in the Atlantic, are directed at protecting leatherback and loggerhead sea turtle populations. Both sides have moved for summary judgment. While I sympathize with plaintiffs' concerns, the law seems clear. For the reasons set forth below, plaintiffs' motion for summary judgment [docket entry # 59] is **DENIED** in all respects, and the cross-motions of defendants [docket entries # 65 and 70] are **GRANTED**.

## I. *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

### A. *Facts and Statutory Scheme*

#### 1. *The Magnuson–Stevens Act and NMFS*

The Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. § 1801 *et seq.*, vests in the Department of Commerce the authority to regulate fisheries and fishing activities in—and in certain instances beyond—U.S. federal waters. The statute articulates a number of policy objectives, two of which are pertinent to this case: with the Magnuson–Stevens Act Congress intends (1) "to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species," 16 U.S.C. § 1801(b)(2); and (2)

> to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective,

*id.* § 1801(c)(3).

The task of pursuing these objectives by regulation has fallen to the NMFS, a federal agency under the purview of the National Oceanic and Atmospheric Administration within the Department of Commerce. The regulatory reach of the NMFS extends as far as 200 nautical miles from the U.S. coastal boundaries. 16 U.S.C. §§ 1811(a), 1802(11); 50 C.F.R. § 600.10. The U.S. claims exclusive sovereign right to manage fisheries within that 200–mile buffer, known as the Exclusive Economic Zone ("EEZ"). Limited circumstances permit the NMFS to reach beyond the EEZ; the Magnuson–Stevens Act provides that the U.S.

> shall cooperate directly or through appropriate international organizations with those nations involved in fisheries for highly migratory species with a view to ensuring conservation and shall promote the achievement of optimum yield of such species throughout their range, both within and *beyond the exclusive economic zone.*

*Id.* § 1812 (emphasis added).

It is the business of the NMFS under the Magnuson–Stevens Act to prepare

Fishery Management Plans ("FMPs") for the fisheries within its jurisdiction. Through FMPs, the NMFS establishes the rules by which fisheries are sustainably harvested, but in crafting its FMPs the NMFS must itself conform to National Standards set down by Congress. These National Standards require, *inter alia*, that conservation and management measures "be based upon the best scientific information available," 16 U.S.C. § 1851(a)(2), and that they "take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities," *id.* § 1851(a)(8).

## 2. *The Fishery Management Plan for Atlantic Tunas, Swordfish, and Sharks*

At issue in this case is the Fishery Management Plan for Atlantic Tunas, Swordfish, and Sharks ("HMS FMP"), instituted and maintained by the NMFS on the authority of both the Magnuson–Stevens Act and the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. §§ 971 *et seq.* Congress enacted the ATCA in 1975 to enable the U.S.'s participation in the International Convention for the Conservation of Atlantic Tunas, the purpose of which "is to protect Atlantic tuna species through international cooperation." *Blue Water Fisherman's Ass'n v. Mineta*, 122 F.Supp.2d 150, 157–58. (D.D.C.2000). The HMS FMP governs the harvesting of swordfish, Atlantic tuna, bluefin tuna, shark, and billfish, *i.e.*, the primary target species of the plaintiffs in their North Atlantic longline fishing efforts. Finalized in April 1999, the HMS FMP authorized a regulated sphere of pelagic longline fishing activity in the NED, a region that stretches from 20 to 60°W and 35 to 55°N and encompasses 2,631,000 square nautical miles of international waters.

Regulations promulgated under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, require that any agency acting "in the United States or upon the high seas" consult with the Fish and Wildlife Service or (as in this case) the NMFS "to insure that [its] action ... is not likely to jeopardize the continued existence" of listed species.[1] 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(a), 402.14(a). The consultation process culminates in the issuance of a biological opinion. 50 C.F.R. § 402.14(g)(4). It is crucial that the NMFS have the "best scientific and commercial data available" to inform its opinion. *Id.* § 402.14(d). It is the duty of the consulting agency to provide it. *Id.* The biological opinion must include a summary of the data supporting the NMFS's conclusions, a "detailed discussion" of the projected effect of the agency action on listed species, and a determination as to whether the proposed agency action will "jeopardize the continued existence of a listed species." *Id.* § 402.14(h). Should the NMFS reach a "jeopardy" conclusion, it is obligated to list in its opinion, if possible, any "reasonable and prudent alternatives" ("RPAs") to the proposed action. *Id.* § 402.14(h)(3).

The conservation efforts of NMFS are themselves subject to the consultation requirement. In this instance, the Office of Sustainable Fisheries ("OSF"), the subdivision of NMFS charged with developing the

---

**1.** The Endangered Species Act empowers the Secretary of Commerce to confer "endangered" or "threatened" status upon marine species, 16 U.S.C. § 1533(a)(1), provided that it makes its determinations "on the basis of the best scientific and commercial data avail-able," 16 U.S.C. § 1533(b)(1)(A). As an agency within the Department of Commerce, the NMFS has the authority to designate species, or "list" them, for regulatory protection under the ESA.

HMS FMP, discharged this obligation through internal consultation with the agency's Office of Protected Resources ("OPR"). The OPR approved pelagic longline fishing in the NED provided that the industry's incidental harm to leatherback and loggerhead turtles—which the NMFS has listed as endangered and threatened, respectively, 50 C.F.R. §§ 224.101(c) (leatherbacks), 223.102(d) (loggerheads)—remained within certain specified limits. In November 1999 the OSF reinitiated consultation with the OPR, based upon preliminary data that longliners' "incidental take"[2] of these species would exceed what OPR had deemed allowable.

OPR reviewed the new data and issued a biological opinion in June 2000 ("First BiOp"). A.R. Vol. 3, Doc. 51. In its analysis OPR observed that "[w]ith respect to loggerhead sea turtles, NMFS currently believes that the continued operation of [pelagic longline] fisheries at current levels of take is not likely to appreciably reduce the likelihood of survival and recovery of the entire species in the wild." *Id.* at 69. The BiOp then reversed course and observed that the present rate of longline activity could result in considerable diminution in the "numbers, reproduction and distribution" of the leatherback turtle and the northern subpopulation of loggerheads, if not the entire loggerhead species. *Id.* More research would be necessary to establish the species-wide effect of harm to that northern subpopulation.

The BiOp concluded that "continued operation of the Atlantic pelagic longline fishery is likely to jeopardize the continued existence of the leatherback sea turtle and loggerhead sea turtles." *Id.* at 83. OPR offered two RPAs that would permit implementation of the HMS FMP. The first of these required that the NED be designated off-limits to pelagic longline fishermen from July through December. *Id.* at 86. The NMFS published emergency regulations implementing the RPAs in October 2000. Atlantic Highly Migratory Species; Pelagic Longline Fishery; Sea Turtle Protection Measures; 65 Fed.Reg. 60,889 (October 13, 2000).

By this time the OFS had already reinitiated consultation with OPR once more on the subject of its HMS FMP. Over the next nine months the NMFS drafted a report of over three hundred pages entitled *Stock Assessments of Loggerhead and Leatherback Sea Turtles and an Assessment of the Impact of the Pelagic Longline Fishery on the Loggerhead and Leatherback Sea Turtles of the Western North Atlantic* ("SEFSC Report"). A.R. Doc. 191. The SEFSC report explored the impact of continued pelagic longline fishing upon the northern subpopulations of the species at risk. Portions of the report addressed other "anthropogenic" effects upon the turtle populations in addition to pelagic longline fishing. *E.g., id.* at 26–30, 79–84. The report's compilers reviewed the literature, collected data, modeled populations, and consulted experts on sea turtles; the work was submitted to three independent experts to review before it was finalized.

The NMFS's Biological Opinion of June 8, 2001 ("Second BiOp") reflected the OPR's review of the SEFSC Report and other material made available to it; it withdrew the language of the First BiOp finding that pelagic longlining posed no likelihood of species-wide harm to loggerhead turtles, and it issued unequivocal findings of jeopardy as to both species. A.R. Doc. 283, at 108 ("[C]ontinued operation of the Atlantic pelagic longline fishery is likely to jeopardize the continued existence of the leatherback sea turtle and the

---

**2.** The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

loggerhead sea turtle ....”). The RVAs remained largely the same: for its HMS FMP to pass muster under the Endangered Species Act, the NMFS would have to close the NED to pelagic longline fishing, but this time on a year-round basis. *Id.* at 111–12.

Accordingly, NMFS set down another Emergency Rule providing for closure of the NED to pelagic longline fishing through January 9, 2002. Atlantic Highly Migratory Species; Pelagic Longline Fishery; Sea Turtle Protection Measures, 66 Fed.Reg. 36,711 (July 13, 2001). NMFS extended the term of the emergency closure and on July 9, 2002 announced a Final Rule implementing the closure indefinitely. Atlantic Highly Migratory Species; Pelagic Longline Fishery; Shark Gillnet Fishery; Sea Turtle and Whale Protection Measures, 67 Fed.Reg. 45,393 (July 9, 2002).

### B. *Procedural History*

On November 8, 2000, less than a month after NMFS's initial closure of the NED took effect, an assembly of vessel owners, operators and other participants with a stake in the pelagic longline fishing industry brought suit against NMFS to challenge the Emergency Rule closing off their access to the NED. That action was stayed while NMFS prepared its Second BiOp. When the Second BiOp issued and gave the plaintiffs no satisfaction, an amended complaint followed, commencing this action.

The plaintiffs filed second and third amended complaints to update their pleadings to reflect NMFS's extension of the Emergency Rule and issuance of the Final Rule. The substance of the plaintiffs' claims, however, has remained the same. The plaintiffs attack the BiOp itself, the disproportionate burden borne by the pelagic longlining fishermen in the sea turtle recovery effort, and NMFS's authority to

control their access to the NED, which lies beyond the EEZ specified in the Magnuson–Stevens Act.

The plaintiffs moved for a preliminary injunction that would permit pelagic longliners to fish the NED pending a final determination of this action. In August 2001 I denied the preliminary injunction motion, on the ground that the Magnuson–Stevens Act expressly "forbids this Court from staying enforcement of an administrative rule pending review on the merits." *Blue Water Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.,* 158 F.Supp.2d 118, 121 (D.Mass.2001) (citing 16 U.S.C. § 1855(f)(1)(A)). The plaintiffs also contested the NMFS's authority to regulate the NED in the first instance, as the area lies entirely outside the EEZ. I rejected this position on the ground that the NMFS prepared its HMS FMP not only in the course of its duties to implement the Magnuson–Stevens Act, but also to assist in the international conservation effort to which the U.S. is a party under the ACTA, so triggering 16 U.S.C. § 1812's authorization of extra-EEZ regulation. *Id.* at 123 ("Thus, in enforcing the HMS FMP in conjunction with foreign efforts under the Convention, 16 U.S.C. § 1812 provides jurisdiction beyond the EEZ.").

The Turtle Island Restoration Network and the Center for Biological Diversity moved to intervene as defendants in this action. I granted that motion on August 24, 2001.

On December 5, 2001, the plaintiffs moved for summary judgment. The federal defendants and defendant-intervenors filed separate cross-motions for summary judgment on January 11, 2002, and a hearing was held on May 20, 2002.

### II. *LEGAL ANALYSIS*

#### A. *Standard of Review*

Fed.R.Civ.P. 56(c) provides, in pertinent part, that a court may grant summary

judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

■ The Magnuson–Stevens Act requires that a court reviewing an agency determination under the statute must apply the Administrative Procedure Act ("APA") standards of review prescribed at 5 U.S.C. § 706(2)(A)-(D). 16 U.S.C. § 1855(f)(1)(B). In accordance with these standards, a regulation is invalid if it is demonstrably "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Supreme Court has explained, an agency rule is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997).

■ Thus, "[i]n reviewing an agency's decision after consultation[, the court's] task is to ascertain whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1049 (1st Cir.1982) (internal quotation marks omitted); *see also NLRB v. Beverly Enterprises—Mass., Inc.*, 174 F.3d 13, 23 (1st Cir.1999) (task of reviewing court is "to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotation marks omitted)). As the Supreme Court observed, "[w]e will ... uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

Although this standard of review "is a narrow one," the court "must undertake a thorough, probing, in-depth review and a searching and careful inquiry into the record," *NLRB*, 174 F.3d at 24 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)) (internal quotation marks omitted). The court must make its determination, however, based "only [on] those facts before the agency at the time of the action." *Recreational Fishing Alliance v. Evans*, 172 F.Supp.2d 35, 40 (D.D.C.2001) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)); *Blue Water Fisherman's Ass'n v. Mineta*, 122 F.Supp.2d at 158.

Plaintiffs offer a number of grounds in support of their challenge to the NED closure. In Counts I and II of their complaint they suggest that the NMFS did not use the "best scientific and commercial data available" in its Second BiOp, as the law requires. Count III alleges that the NMFS based its regulation on an unlawful jeopardy determination as to an unlisted subpopulation of sea turtles, and not the full listed species of loggerheads. Counts IV and V find fault with the NMFS's treatment of the pelagic longlining fishery vis-a-vis other activities that threaten sea

turtle populations. All of these counts are reviewed against the APA standard of deference to agency action. The final count in the complaint attacks NMFS's authority under the Magnuson–Stevens Act to close the NED.

### B. Counts I & II: Did NMFS Use the "Best Scientific and Commercial Data Available" in Formulating Its Jeopardy Finding and the RPAs?

"The best scientific and commercial data available" is the mantra of the Endangered Species Act. The best scientific and commercial data available is to govern additions to and removals from the threatened and endangered lists. 16 U.S.C. § 1533(b)(1)(A). Similarly, jeopardy consultations prior to agency action must issue on the basis of the best scientific and commercial data available, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8), and data of the same quality must inform the RVAs that follow consultation, 50 C.F.R. § 402.14(g)(8). Finally, the NMFS, when it regulates under the Magnuson–Stevens Act, must base its conservation decisions on the best scientific data available. 16 U.S.C. § 1851(a)(2) ("National Standard 2"). Though they mount no challenge to the lists, the plaintiffs argue that the OPR neglected the best data when it made its jeopardy findings as to loggerhead and leatherback turtles and framed the RVAs that required closure of the NED to their fishing activities.

 A number of courts have had occasion to explain how the "best data" requirement jibes with the deferential standard of review this court must give to agency actions. In *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the Court observed that the "best data" requirement is in place "to ensure that the ESA not be implemented haphazardly, on the basis of speculation or sur-

mise." *Id.* at 176, 117 S.Ct. 1154. An agency determination must not "disregard superior data," *Building Indus, Ass'n of Superior California v. Norton*, 247 F.3d 1241, 1246–47 (D.C.Cir.2001), but imperfections in the available data do not doom any agency conclusion: "the Service must utilize the 'best scientific data *available,*' not the best scientific data *possible,*" *id.* at 1246 (emphasis in original).

 The agency's conclusion need not be airtight and indisputable. "When an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.'" *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir.1992). This Court therefore may not champion a competing interpretation of the data over an agency's conclusion that finds support in the record. *Id.* ("We agree with the district court that the Secretary acted within his discretion in choosing the data on which to rely ...."). Nor should this Court pretend to have an expertise in scientific matters greater than the challenged agency's. *Bays' Legal Fund v. Browner*, 828 F.Supp. 102, 107 (D.Mass.1993) ("[W]here there is a factual dispute involving issues of science, which implicates substantial agency expertise, deference is owed to the informed decisionmaking of the responsible agency.") (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), and *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

The plaintiffs contend that the NMFS manipulated and ignored the data to arrive at a jeopardy conclusion that would support closure of the NED. They point first

to the critiques of three peer reviewers of a draft of the SEFSC Report, from which the OPR constructed its Second BiOp. This peer review identified a number of analytical and modeling deficiencies and recommended improvements. The NMFS took account of the peer reviewers' suggestions and altered the study to reflect their suggestions.

■ It is noteworthy that the comments of the peer reviewers were generally complimentary and that they had no argument with the body of data that the NMFS reviewed. A.R. Doc. 200, at 1 (review of Dr. YouGan Wang) ("Separate status reports for the loggerhead and leatherback sea turtles have been developed based on the best available information. Estimation methods used for trend, catch, and mortality of these sea turtle stocks are appropriate."); A.R. Doc. 205, at 1 (review of Dr. Ian Poiner) ("The analysis, results and conclusions in the report represents [sic] the best scientific information on which to proceed with fishery management."). And though, as the plaintiffs observe, Dr. Wang concluded from the data that the pelagic longline bycatch threat to turtle populations was minimal, Mr. Mohn found the NMFS's conclusions to the contrary "well considered from the available analysis." A.R. Doc 189, at 2 (review of Robert Mohn). Thus, in reviewing and rejecting Dr. Wang's position, the NMFS did not ignore the best available data. Rather, it considered and disagreed with Dr. Wang's interpretation of the data.

Plaintiffs' remaining challenges under the "best data" requirement are similarly resolved. The plaintiffs contest the NMFS's bycatch projections—that is, they dispute the agency's extrapolations from observed and reported bycatch to the entire pelagic longline industry. They further dispute some of the NMFS's decisions allocating bycatch among subclassifications, as well as the post-release mortality rates the NMFS assigned to these categories. These challenges likewise fail to meet the strict standard for a challenge to agency action.

For example, the NMFS found turtles that ingested longliner's hooks subject to a 42% mortality rate versus 27% for those hooked externally. Second BiOp, A.R. Doc. 283, at 87. In its Second BiOp the NMFS estimated industry-wide bycatch mortality of loggerhead and leatherback turtles based on observed bycatch of the turtles in 1999. Nine leatherbacks were observed hooked in beak or mouth in 1999. Reluctant to classify the nine as necessarily deep hooked (42% mortality rate) or externally hooked (27%), the NMFS ran projections for both mortality rates. The plaintiffs object that the NMFS should not have run higher-mortality projections because other data cited in the BiOp shows that zero leatherbacks were observed hooked in the throat or esophagus. *Id.* at 86 tbl.7. The defendants counter that the reports regarding the nine hooked turtles did not adequately explain whether the hook was ingested and/or what damage it did to soft tissues. To be careful, then, the NMFS based its mortality estimates on both mortality rates.

The NMFS's decision to run statistics based on both mortality rates typifies the thoroughness and conscientiousness with which it prepared its Second BiOp. The ultimate jeopardy determination did not turn on a 42% mortality rate. Indeed, the NMFS's analysis seems to settle instead upon the 27% rate:

> It is reasonable to expect that the HMS fisheries that could capture as many as 796 leatherback turtles in a year, killing as many as 202 of them (based on a 27% mortality rate and the higher year[']s data), would reduce the species numbers (these are average estimates, NMFS would expect the actual number of leath-

erback turtles killed in a particular year to be less than or greater than this estimate). Assuming that some of these turtles would be female, NMFS would also conclude that these deaths would reduce the species' reproduction in addition to reducing their numbers. *Id.* at 105.

At a certain point an agency might so liberally manipulate and interpret data as to "fudge" conclusions utterly unsupportable by any reasonable application of the scientific method. Such treatment of the "best data" would rise to the level of "arbitrary and capricious" and would require intervention of the reviewing court. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856. That is not the case here. As the NMFS's conclusions plausibly follow from the data before it, I must defer to the agency's findings. Accordingly, the plaintiffs' challenges to the NED referencing the "best data" requirements of the Endangered Species Act and National Standard 2 are unsustainable.

### C. Count III: Was NMFS's Jeopardy Finding Made as to the Turtle Species As They Were Listed?

The plaintiffs object that the NMFS's closure of the NED essentially reduces to an effort to preserve unlisted subpopulations of leatherback and loggerhead turtles, which the ESA does not allow. The First BiOp, after all, took the view that "[w]ith respect to loggerhead sea turtles, NMFS currently believes that the continued operation of [pelagic longline] fisheries at current levels of take is not likely to appreciably reduce the likelihood of survival and recovery of the entire species in the wild." A.R. Doc. 51, at 69.[3] The First BiOp took further notice that pelagic longlining in the NED threatens the northern

subpopulation of loggerheads and maintained that more research was necessary to explore the extent to which harm to this subpopulation puts the entire species at greater risk. *Id.* Then the First BiOp found that the HMS FMP as written jeopardized both species, notwithstanding its earlier, contradictory statement about the loggerheads.

Embracing the language in the First BiOp that supports their view, the plaintiffs contend that the jeopardy the NMFS identified extended only to the northern subpopulation of loggerhead turtles. And although subpopulations are eligible for protection under the Endangered Species Act, 16 U.S.C. § 1532(16), they must make the "threatened" or "endangered" list first. The parties do not dispute that the northern subpopulation of loggerhead is not independently listed.

■ But a Second BiOp has since supplanted the first, omitting the language crucial to the plaintiffs' argument, that the continuation of pelagic longlining in the NED will cause no measurable harm to the loggerhead species in its entirety. The plaintiffs account for this difference by suggesting that the Second BiOp is covering up its predecessor's tracks. This is not the case. The First BiOp called for more research to determine to what extent harm to the northern subpopulation would resonate more broadly in the entire loggerhead species. The Second BiOp resolved this issue with its conclusion that

> [g]iven the size of loggerhead populations in the western Atlantic Ocean, particularly the northern subpopulation, and the effects of other fisheries and sources of mortalities on the various nesting aggregations, this would appreciably reduce the population's size and

---

**3.** The plaintiffs notably do not cite any similar language in the First BiOp as to leatherback turtles.

reproductive capacity in a way that would be expected to appreciably decrease this population's likelihood of surviving and recovering in the wild.

A.R. Doc. 283, at 103–04.

The Second BiOp's broader findings of jeopardy as to both the loggerhead and leatherback species are uncontroverted within that document. In effect, the Second BiOp settles the question its predecessor left open, regarding the translation of take from the northern subpopulation of loggerheads to species-wide harm. To impress an RVA upon an acting agency under the Endangered Species Act, the NMFS must make a jeopardy finding as to a listed species. There is no statutory provision that would prohibit NMFS from predicating its species-at-large jeopardy finding on the impact of a threat to a subpopulation, provided that sound science supports its analysis.

The NMFS found that the southeastern U.S. nesting aggregation of loggerhead turtles, which accommodates a number of subpopulations including the northern subpopulation vulnerable to pelagic longliners, "is a critical component of its species." Second BiOp, A.R. Doc. 283, at 34. It further found that harm to one subpopulation is unrecoverable, because "[n]atal homing [4] to the nesting beach provides the genetic barrier between ... subpopulations, preventing recolonization by turtles from other nesting beaches." *Id.* at 32. Moreover, the gender breakdowns of the northern (65% male/35% female) and southeastern (20% male/80% female) subpopulations suggest that the northern subpopulation provides crucial male mates to females nesting further down the coast. *Id.* at 34; SEFC Report, A.R. Doc. 191, at 31. Reasoned, scientific analysis supported the NMFS's conclusion that the continued loss of turtles in significant numbers to pelagic longline bycatch would leave a permanent dent in the loggerhead species. The governing standard of review does not allow me to second-guess that analysis.

**D. Counts IV & V: Did NMFS Arbitrarily and Capriciously "Single Out" Pelagic Longlining Fisheries over Other Activities That Harm the Listed Turtles, and Did NMFS's Closure of the NED Arbitrarily and Capriciously Assign the Full Burden of Recovery to the Plaintiffs?**

The plaintiffs object that the longline fishing industry is just one small contributor to the jeopardy of the leatherback and loggerhead turtle populations. Consequently, they argue, the Second BiOp's jeopardy finding as to pelagic longline fishing was arbitrary and capricious. •

■ It is appropriate—and necessary—that the OPR "[e]valuate the effects of the action and cumulative effects on the listed." 50 C.F.R. § 402.14(g)(3). The term "cumulative effects" is defined in the regulations to mean "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* § 402.02. The NMFS's ultimate task as an ESA consultant is to determine "whether the action, *taken together with cumulative effects,* is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4) (emphasis added). To be passable under ESA regulations, then, the NMFS's jeopardy finding did not have to single out the pelagic longline fishery as *the* predominant activity jeopardizing the

---

**4.** "Natal homing" refers here to the tendency of female sea turtles to return to their specific place of birth to nest.

listed turtle populations. The NMFS need only have found that the pelagic longlining threat together with other cumulative effects add up to jeopardy. This is exactly what the NMFS did.

In the course of its jeopardy analysis, the Second BiOp devoted considerable attention to other anthropogenic effects on the loggerhead and leatherback turtle populations. The NMFS cited U.S. Coast Guard and U.S. Navy vessel operations in the North Atlantic, military training exercises, and dredging activities as cumulative effects directly attributable to federal action. A.R. Doc. 283, at 50–52. The Second BiOp also explored the impacts upon turtle populations of other state and federally managed fisheries, marine pollution, and state and private vessels, among still other contributing factors. *Id.* at 52–66. The NMFS calculated the contributions of these other factors into its final analysis:

> "After reviewing the current status of the ... leatherback [and] loggerhead ... sea turtles, *the environmental baseline for the action area*, the effects of the continued operation of the fisheries managed under the Atlantic HMS FMP, the record of compliance with requirements of previous Opinions on HMS fisheries, *and probable cumulative effects*, it is NMFS' biological opinion that ... continued operation of the Atlantic pelagic longline fishery is likely to jeopardize the continued existence of the leatherback sea turtle and the loggerhead sea turtle ...."

*Id.* at 108 (emphasis added). This approach is wholly consistent with ESA regulations.

■ The plaintiffs next argue that closure of the NED, a recovery gesture centering on the damage done by pelagic longliners to the exclusion of other anthropogenic harms, requires that they shoulder more than their share of the burden of species protection.

It was the OPR's task in this case to consider the potential effect of the HMS FMP's authorization of pelagic longline fishing in the NED on the loggerhead and leatherback turtle species. OPR's legal responsibility in reviewing the HMS FMP was strictly to insure that the proposed agency action was not likely to jeopardize listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(a), 402.14(a). In its statutory and regulatory role as consultant to the OFS, the OPR had no occasion—and certainly no obligation—to regulate activities beyond the scope of the HMS FMP.

Moreover, the plaintiffs advance no support in the statutes or case law for this disproportionality argument, which reduces to an impracticable "all now or nothing ever" approach. The plaintiffs cite *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), for the proposition that agencies may not impose undue burdens on industry in their pursuit of ESA directives. But the *Bennett* Court does not take this position. Rather, it explains that the ESA's "best data" requirements mean to tie ESA regulations to hard science, in order to obviate the "needless economic dislocation" that necessarily follows from unaccountable regulation. *Id.* at 176–77. As I explained above, the Second BiOp amply meets the "best data" standard.

The *Bennett* Court's disfavor for "needless economic dislocation" is well taken, but it does not extend to prohibit the actions the NMFS has implemented. If the plaintiffs' logic prevailed, recovery efforts under the ESA could never proceed incrementally, as the first party to suffer the adverse effect of a recovery effort could resist regulation on grounds of differential treatment. Nothing in the ESA forecloses piecemeal or incremental pursuit of the goal of species protection. This approach is consistent with the practice of

administrative agencies generally. *See U.S. Air Tour Ass'n v. F.A.A.*, 298 F.3d 997, 1010 (D.C.Cir.2002) ("[O]rdinarily, agencies have wide latitude to attack a regulatory problem in phases."). While Counts IV and V of the complaint give a compelling and sympathetic sketch of the plaintiffs' predicament, the law unfortunately provides no redress for the inequity they identify.[5]

### E. Count VI: Does the NMFS Have the Authority to Close the NED?

#### 1. Jurisdiction Over the NED

In their motion, plaintiffs reassert their position—which I rejected at the preliminary injunction stage—that the NMFS has no authority to restrict their access to the international waters in the NED.

The Magnuson–Stevens Act expressly permits the U.S. government to regulate beyond the confines of the EEZ, under certain conditions. 16 U.S.C. § 1812. Section 1812 provides as follows:

> The United States shall cooperate directly or through appropriate international organizations with those nations involved in fisheries for highly migratory species with a view to ensuring conservation and shall promote the achievement of optimum yield of such species throughout their range, both within and beyond the exclusive economic zone.

*Id.* The section can be read to afford narrow or broad regulatory powers beyond the EEZ, depending on the construction of "such species." If "such species" is read simply to mean the "highly migratory species" earlier in the sentence, NMFS's regulatory authority as to highly migratory species (and therefore pelagic longline fishing) admits of no territorial restriction. A more limited reading of the term requires that the NMFS be acting pursuant to an international cooperative effort to conserve highly migratory species.

In either case, the NMFS has full authorization under the Magnuson–Stevens Act to bind ships under the U.S. flag to its HMS MFP, be they within or without the Exclusive Economic Zone. The plan's focus on highly migratory species alone gives the NMFS jurisdiction under the broad reading of the statute. And, in any case, as I observed at the preliminary injunction stage, "the NMFS ordered the emergency closure of the NED in direct cooperation with international efforts to conserve highly migratory species." *Blue Water Fishermen's Ass'n,* 158 F.Supp.2d at 123. Thus even the narrower reading of § 1812, requiring action in the context of an international conservation effort, would authorize the NMFS to take the action that it did.

The plaintiffs' argument that there is no international convention for the preservation of sea turtles is beside the point. The ATCA, which enables U.S. participation in the International Convention for the Conservation of Atlantic Tunas, provides the basis for the HMS FMP's expanded territorial scope under § 1812. The concessions that ESA and its supporting regulations carve out of the HMS FMP do not alter that scope. Accordingly, resolution

---

**5.** The complaint invokes due process and equal protection principles, but the plaintiffs did not argue these points at the summary judgment stage. In any event, my "best data" analysis above confirms that closure of the NED was not so irrational a response as to rise to the level of a constitutional violation. *Gun Owners' Action League v. Swift,* 284 F.3d 198, 215 (1st Cir.2002) (equal protection case) ("In the realm of social and economic regulation, a classification passes the rational basis test 'if any reasonably conceivable set of facts could establish a rational relationship between [it] and the ... government's legitimate ends.'" (quoting *Tenoco Oil Co. v. Dep't of Consumer Affairs,* 876 F.2d 1013, 1021 (1st Cir.1989) (due process case))).

of the statute's ambiguity is unnecessary, because the NMFS's authority in this instance does not turn on the distinction.

### 2. *The Magnuson–Stevens Act*

The plaintiffs identify two related provisions of the Magnuson–Stevens Act that, they argue, make closure of the NED unlawful. The first of these is National Standard 8, described above, which requires that the NMFS take sufficient account of the stake of fishing industries as to minimize the economic impact of its regulations. 16 U.S.C. § 1851(a)(8). The second requires that the NMFS consider and minimize the disadvantage to American fishermen vis-a-vis their foreign competitors. 16 U.S.C. § 1854(g)(1)(C). Neither provision is absolute; in fact, both provisions ask that the NMFS minimize economic disadvantage "to the extent practicable."

The NMFS has met these requirements. Mandatory consultation of the OPR under the ESA returned a verdict that the agency must close off the NED. Second BiOp, A.R. Doc. 283, at 111 ("NMFS must commence rulemaking immediately upon issuance of this opinion to promulgate regulations that close the entire NED area to fishing with pelagic longline gear for U.S. vessels."). The NMFS had no alternative but to comply. Confronted with closure of the NED or the wholesale scuttling of the HMS FMP, the NMFS selected the more economically favorable of the two options available to the plaintiffs.

Moreover, the NMFS took steps to redress the economic displacement worked by its regulations. The agency offered pelagic longline fishermen the opportunity to participate in an experimental fishery in the NED. 66 Fed.Reg. 42,995, 42,996 (Aug. 16, 2001). The fishermen are to use new methods and gear directed at reducing harm to sea turtle populations. A.R. Doc. 298, at 14, 18. The NMFS, in turn, evaluates the viability and success of the innova-

tions, compensates the fishermen financially for their assistance with the experiment and allows them to keep what they catch. *Id.* This provision certainly does not make up the loss of regulation to the plaintiffs. Nonetheless, it demonstrates that the NMFS has not acted without consideration of the economic consequences for pelagic longline fishermen.

### 3. *Quota Allocations Under the ACTA*

Finally, plaintiffs point to the provision of the ACTA that prohibits regulations under that statute to "have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a recommendation of the Commission." 16 U.S.C. § 971d(c)(3). The defendants' view is that the ESA's own imperatives override those of the ACTA, and OFS must accept closure of the NED as the only alternative to the outright elimination of the pelagic longline fishery as outlined initially in the HMS FMP.

Both parties wrongly presume that the statutes are in direct conflict. 16 U.S.C. § 971d(c)(3) forbids the institution of regulations that will increase or decrease the "allocation or quota of fish or fishing mortality level *to the United States*." *Id.* (emphasis added). Though it may decrease the overall catch of American pelagic longliners, closure of the NED in no way alters the portion of the fishery parceled out to the U.S. for regulatory purposes under the Convention. Section 971(c)(3) means to ensure that states do not unilaterally adjust their allotments under the treaty at the expense (or to the benefit) of other states. It does not entitle the fishermen under a given state's flag to fish to quota.

### III. *CONCLUSION*

For the reasons stated above, the plaintiffs' motion for summary judgment is **DE-**

NIED, and defendants' cross-motion for summary judgment **GRANTED.**

**SO ORDERED.**

### *JUDGMENT*

For the reasons explained in the accompanying Memorandum and Order re: Summary Judgment, **it is hereby ordered:**

**JUDGMENT FOR THE DEFENDANTS** National Marine Fisheries Service and Secretary of Commerce; judgment for Defendant–Intervenors Turtle Island Restoration Network and Center for Biological Diversity.

**SO ORDERED.**